No. 47,801

PATRICK CLARKE and MILDRED R. CLARKE, et al., *Appellants,* v. THE CITY OF WICHITA, *Appellee,* and HARRY B. GARDEN and MARY A. GARDEN, et al., *Appellants,* v. THE CITY OF WICHITA, *Appellee.*

(543 P. 2d 973)

Opinion filed December 13, 1975.

*Paul V. Dugan,* of Wichita, argued the cause, and was on the brief for the appellants.

*H. R. Kuhn,* of Arn, Mullins, Unruh, Kuhn & Wilson, of Wichita, argued the cause, and *John Dekker,* of Wichita, was with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal from a decision of the District Court of Sedgwick County rejecting the landowners' constitutional

and procedural attacks upon two municipal annexation ordinances and refusing to enjoin the City of Wichita from annexing three areas of land immediately to the west of the City's boundary line.

The essential facts are not seriously disputed. The City of Wichita, Kansas, (defendant-appellee) is a governmental body located in Sedgwick County, Kansas. Patrick Clarke and Mildred R. Clarke, et al., (plaintiffs-appellants) were as of July 29, 1974, residents of the Callahan Addition. Harry B. Garden and Mary A. Garden, et al., (plaintiffs-appellants) were as of August 23, 1974, residents of the Westport Addition. They bring these actions pursuant to the provisions of K. S. A. 1974 Supp. 12-520 which now permits an owner of land annexed by a city to "maintain an action in the district court of the county in which such land is located challenging the authority of the city to annex such lands and the regularity of the proceedings had in connection therewith." The two separate actions were consolidated for trial in the district court.

Added by the City of Wichita were the Callahan and Westport Additions, both platted, and a third unplatted area less than twenty acres in size and having two-thirds of its boundary line adjacent to the city. In addition to being immediately west of the City's boundary line, the north line of the Callahan Addition adjoins the existing City's boundary line and the Westport Addition is immediately adjacent to and adjoins the south boundary line of the Callahan Addition.

On May 7, 1974, the City Commission of the City of Wichita adopted a resolution declaring its interest in annexing the above mentioned tracts. This resolution was duly published; notice was mailed to the residents; sketches of the area to be annexed were included; a "plan" for the extension of major services was prepared; and a public hearing was held which answered all questions posed by the residents. On July 23, 1974, and August 13, 1974, the City Commission of the City of Wichita adopted by a three-to-two vote two ordinances annexing the above mentioned tracts. The first ordinance annexed only a portion of the area described in the resolution, and the second ordinance adopted the remaining portion of the area described by the resolution. Robert A. Lakin, the City representative at the trial, described why two ordinances were used as follows:

"Although we were advised we could do it all in one Ordinance, this goes back as administrative decision and judgment based on prior advice that we had in the 1960's to try to separate out tracts into separate Ordinances and

you will find that the City of Wichita has historically done this from late 1959 to the current days and our staff, in preparing these Ordinances, simply prepared them in that fashion and what I term 'abundance of caution' in preparing and maintaining the Ordinances."

Material to a determination of this dispute is the "plan" for the extension of major services prepared by the City. K. S. A. 1974 Supp. 12-520b provides:

"The governing body of any city proposing to annex land under the provisions of section 4 [12-520] of this act shall make plans for the extension of services to the area proposed to be annexed and shall, prior to the adoption of the resolution provided for in section 2 [12-520a] of this act, prepare a report setting forth such plans. The report shall include:

"(a) A sketch clearly delineating the land proposed to be annexed and the area of the city adjacent thereto to show the following information:

"(1) The present and proposed boundaries of the city affected by such proposed annexation;

"(2) The present streets, water mains, sewers and other city utility lines, and the proposed extension thereof;

"(3) The general land use pattern in the areas to be annexed.

"(b) A statement setting forth the plans of the city for extending to the area to be annexed each major municipal service provided to persons and property located within the city at the time of annexation, setting forth the method by which the city plans to finance the extension of such services to such area. Such statement shall also include a timetable of the plans for extending each major municipal service to the area annexed.

"The preparation of a plan for the extension of services as herein before required shall not be required for or as a prerequisite to the annexation of land all of the owners of which petition for or consent to such annexation in writing."

The report of the City disclosing its plans for the annexation is fully set forth herein. It reads:

"A Report on the Plans and Availability of Municipal Services for an Area Under Consideration for Annexation Located Between Maple Avenue on the North, the Santa Fe Railroad Right-of-Way on the South, Tyler Road on the East and Seville Street on the West.

"The Board of City Commissioners of the City of Wichita has expressed interest in the annexation of the area as generally defined above. Kansas law requires that prior to the annexation of land, a report be prepared and placed on file with the City Clerk which sets out the plans of the municipality for providing major municipal services. A timetable for the provision of these services and an indication as to the methods of financing is also required.

"The following information has been compiled by the principal Departments of the City of Wichita that would be responsible for the provision of services to newly annexed areas. A series of maps accompanies and is an integral part of this report. The maps, numbered 1 through 6, indicate the proposed City boundary extension, the existing county zoning, the existing

land use, the existing and proposed extensions for sewer and water service, and the existing street conditions of the subject area.

"Three of the maps have a specific statement attached thereto explaining the extension of municipal services. These statements are repeated in part in this Report along with comments regarding other municipal type services available to the study area. These services and an indication of timing and financing are summarized in Appendix 'A' to this Report.

"*Existing Development.*

"The general area is developed primarily for residential purposes. Commercial activities occur along Kellogg and a convenience food store is located at the southwest corner of the Tyler and Maple intersection. A few industrial and warehousing uses are located along the Railroad right-of-way to the south of Kellogg. There are two churchs and a fire station (County) located on Tyler Road in the Callahan Addition. Vacant residential lots still exist in the Westport and Callahan Additions and there are several vacant commercial sites along Kellogg.

"The entire area contains 249 dwelling units, all of which are single family homes. This represents an increase of 18 units since 1970. There are also 87 vacant lots remaining which are platted for residential use. The Callahan Addition contains 51 vacant lots ranging from 16,900 square feet to 22,950 square feet in size and Westport contains 36 vacant lots, 10 of which average 22,450 square feet in size and are platted and zoned for residential purposes. The remainder are zoned for commercial purposes ranging in size from 19,800 square feet to 55,200 square feet and are located primarily along Kellogg Avenue.

"In regard to the population living in the area, the 1970 U.S. Census enumerated 841 persons living in the Callahan-Westport Additions. On the basis of the number of dwelling units in 1970, there would therefore be a density of 3.64 persons per dwelling unit. Using this density, it is projected that 906 people currently live in the area and the area has the potential of increasing by another 317 persons when fully developed.

"From the preceding information, the area is considered to be urban in character and is continuing to develop to urban densities.

"The physical facilities existing to serve this area consist primarily of roadways and a County fire station. The area does not have a municipal type water or sewer system nor do urban type sidewalks or street lights exist.

"*Street Conditions.*

"In regard to existing roads, nearly all are constructed without curbs and gutters to less than urban standards. Most are asphalt mat with remainder being sand and gravel. The approximate mileage of roadways by type of construction is as follows:

|  | Callahan | Westport | Metes & Bounds | Total |
|---|---|---|---|---|
| Concrete | ... | 0.60* | ... | 0.60 |
| Asphalt Mat | 3.93 | 1.92** | 0.25 | 6.10 |
| Sand & Gravel | 1.25 | 1.00 | 0.43 | 2.68 |
| Unopened | ... | 0.05 | ... | 0.05 |
| Total | 5.18 | 3.57 | 0.68 | 9.43 |

* U. S. 54 Highway
** Includes 1 mile of frontage roads along U. S. 54

"The type of construction influences the annual roadway maintenance costs. The City's Engineering Department estimates the costs at $1000/year/mile for gravel surfaced streets and $3,500/year/mile for asphalt mat, as compared to $500/year/mile for streets constructed to City standards. The Engineering Department has further estimated that the cost of reconstructing the streets in the study area would be $1,621,700. Except for the Arterial streets (Tyler and Maple) reconstruction to City standards would be on the basis of a petition from property owners. On the basis of the above estimate the per acre cost to the area benefited would be $6,760/acre.

"*Water and Sewer Services.*

"As indicated previously, the study area does not have municipal water or sewer services. The City Engineering Department and the Water Department have estimated the costs to the area of providing these services. Sewer service would require the construction of a main sewer and lateral sewers. The main sewer may be ordered in by the City whereas the laterals would be constructed on a petition basis. The estimated cost to the study area for its portion of a sewer main would be $250,000 which approximates $550/acre. The laterals would cost an estimated $536,000 or $2250/acre to install.

"The Water Department has indicated that the area could be served by extension from an existing 16-inch water main located along Tyler Road. Construction of an adequate water service system for the area is estimated to cost the area $399,400 or an average of $1,016.29 per lot. Water service, like sewer laterals, would be extended on the basis of a petition from property owners. Service installation to each lot is estimated to cost an additional $130.00.

"*Fire Protection.*

"At the present time, the study area is served by the County Fire Department from their station located on Tyler Road. The County Fire Department can respond to a fire with two pumper trucks, one 1750 gallon water tank and 5 men. The Wichita Fire Department has indicated that with the completion of their new station (anticipated in May of 1975) at Caddy and Central Avenue, they will be able to respond to a fire in the area with 3 pumpers, one 65-foot aerial unit, 1 car, and sixteen men. The Department has indicated that the additional direct costs to them would be in the form of fire hydrant rentals at $20/each. If the hydrants were located in accordance with a new water system for the area, it is estimated the direct costs would be $600/year.

"*Police Protection.*

"In regard to police protection, the Wichita Police Department has indicated that serving the area would not require additional personnel or capital

outlay. The Department has also indicated that two additional special services would become available to the area. Family Crisis Intervention Unit and Crime Prevention Building Survey personnel would provide services which are unavailable from any other enforcement agency in this area.

"*Parks and Recreation.*

"The staff of the Wichita Board of Park Commissioners has indicated that consideration would be given to extending summer playground services to Benton Elementary School should the subject area be annexed. The cost to the City for this service would be approximately $1,500. Another $1,500 it estimated to be expended by the Park Department for tree services associated with the area under consideration. The Park Department also indicates that existing park sites and planned improvements should adequately serve the area. A large semi-regional park (Pawnee Prairie) exists immediately south of Harry Street.

"*Other Municipal Services.*

"Other services that would be available to the subject area include licensing services, code enforcement, refuse collection, street lighting, and signing. Most of these services are supported by fees and general taxes to cover administrative expenses. The Department of Public Works has estimated that street lighting and signing could be provided the subject area at a cost to the city of $3,852.60. Should the area be annexed into the city, the additional services of the Sanitation Division of the Department of Public Works would be available. The cost per quarter (every three months) for regular volume service, which included five—thirty gallon containers, is $8.50. Refuse service is also available at no cost to those who qualify because of low-income levels.

"Summary of Plan for Services

| Service | Existing in City | Proposed for Area | Timing | Financing |
|---|---|---|---|---|
| Sewer Mains ...... (submains) | yes | yes | when laterals are petitioned for by owner | 50% City-at-large 50% Special Assessment |
| Sewer Laterals ..... | yes | yes | when petitioned for by owners | 100% Special Assessment |
| Water Mains ...... (submains) | yes | yes | when petitioned for by owners | 100% City for excess of 8″ line |
| Water Laterals ... | yes | yes | when petitioned for by owners | Special assessment for lines up to 8″ |
| Fire Hydrants ..... | yes | yes | with water lines (see above) | 100% City-at-Large |
| Arterial Streets .... | yes | yes Tyler Rd. | 1978 | 50% City-at-Large 50% Special Assessment |
| Police Protection ... | yes | yes | Immediate | City-at-Large |
| Fire Protection .... | yes | yes | Immediate | City-at-Large |

| Service | | | | |
|---|---|---|---|---|
| Street Lights ..... | yes | yes | Immediate | City-at-Large |
| Park Site ......... | yes | no | (park site immediately available south of subject area) | |
| Licensing ........ | yes | Available upon Application | Immediate | City-at-Large Fee Supported |
| Code Enforcement.. | yes | | Immediate | City-at-Large Fee Supported |
| Refuse Collection... | yes | Available Upon Request | Immediate | Fee Supported" |

The appellants presented a proffer of evidence which attacks the "plan" as costing approximately $6,000 per half-acre lot for streets, water and sewer lines, but without providing better service. Among other things, the appellants' proffer of evidence indicated present street maintenance was satisfactory. Based on past experience, it was contended the City might change the present asphalt mat streets back to gravel streets because the cost of maintenance was lower. Objection was also raised because the "plan" proposed making arterial streets conform to City streets in 1978, yet it was testified there was no binding effect in this 1978 date; that it might be changed, postponed, or never occur. Finally nothing in the "plan" mentions other street improvements.

The appellants' proffered evidence to prove there had been no health hazards develop in the area annexed due to the private septic tank systems and private water well systems. Under the "plan" municipal water and sewer systems were to be installed in the area "when petitioned for by owners", which might never occur. Furthermore, a change of policy by the City Commission might prevent the extension.

The appellants' proffer of evidence indicated the present county fire department has a station within the area annexed, while the nearest City of Wichita fire stations are four and five miles, respectively, from the area annexed. Furthermore, most of the area presently lacks fire hydrants which will not be installed until the water mains are installed—"when petitioned for by owners." The appellants contend this makes the county's pumper unit more feasible.

Service by the Sedgwick County Sheriff's Department was said to be totally and wholly satisfactory before annexation. It is alleged by the appellants there will be no improvement in police protection and law enforcement in the area and there exists the probability that the same will not be adequate after annexation.

The appellants have properly filed their suits, which were consolidated by the trial court, and have duly perfected an appeal from the decision of the trial court. On appeal they raise many constitutional and procedural objections aimed at the "plan" particularly on the availability of municipal services for the area under consideration for annexation.

The appellants contend the annexation law under which this annexation was conducted (House Bill No. 1623, L. 1974, ch. 56) is so vague and uncertain in its terms "plan", "timetable", and other terms that it is an unconstitutional delegation of legislative power. They contend this grant of legislative authority is not accompanied by adequate standards or guideposts for its exercise. (Citing *State, ex rel., v. City of Overland Park*, 215 Kan. 700, 527 P. 2d 1340.) It is argued each city that "undertakes an annexation will construe its own definition of 'plan' and 'timetable'." The appellants argue the "plan" was orally amended at the public hearing.

The trial court's finding that the plan "substantially satisfied" the statutory requirements is attacked by the appellants on two grounds. First, it is said the timing and plan for financing was uncertain because the plan was not a guarantee or commitment. Second, the annexation which was accomplished by two ordinances is attacked as not strictly complying with the annexation statute.

Finally, the appellants contend the trial court erred in not considering the question of unfairness or unreasonableness of the annexation by the City. Here the appellants argue the prior law that it is not a proper judicial function for a court to inquire into the reasonableness, wisdom, necessity or advisability of annexing and platting land (*Sabatini v. Jayhawk Construction Co.*, 214 Kan. 408, 520 P. 2d 1230)—has been changed. It is urged the legislature would not have required steps relating to "plans" and "timetables", if it had not intended to impose a requirement of reasonableness for the annexation.

I

Are adequate standards present in the amended annexation law for municipal annexation?

It has been established that the legislature may grant municipalities the authority to extend their boundaries provided the grant be accompanied by adequate standards or guideposts for its exercise. (*State, ex rel., v. City of Overland Park*, supra.) Before a municipality may annex outlying territories, certain geographical condi-

tions enumerated in K. S. A. 12-520 (now K. S. A. 1974 Supp. 12-520), must be satisfied. In 1974 this court held these geographic requirements provided meaningful standards in the sense they at least reflected legislative policy. (*State, ex rel., v. City of Overland Park,* supra at 708.) These meaningful geographical standards remain as a guidepost for municipal annexation. (K. S. A. 1974 Supp. 12-520.) In the case at bar there is no question but what the geographical standards were met. They are not challenged by the appellants. In 1974 the legislature supplemented these geographical standards with the "plan" and "timetable" requirements of K. S. A. 1974 Supp. 12-520b. (See also, K. S. A. 1974 Supp. 12-520a.) The legislature would not have amended the annexation act unless it intended to effectuate some change. (*Curless v. Board of County Commissioners,* 197 Kan. 580, 587, 419 P. 2d 876.)

Do the additional "plan" and "timetable" requirements enumerated in K. S. A. 1974 Supp. 12-520b make the legislative standards meaningless? We think not.

The law is well established that the historical background of a legislative enactment, and the circumstances attending its passage, should be taken into account. (*State, ex rel., v. City of Overland Park,* supra.)

A brief look into the legislative history of the 1974 amendment to the annexation law of Kansas discloses a Legislative Research Department Memorandum dated January 5, 1973. The subject is entitled "Kansas Annexation Procedures and Alternative Methods and Standards." Among the many topics discussed thereunder is one entitled "Statutory Standards for Unilateral Annexation." Another topic is "Capacity of the City to Supply Services to the Annexed Area." The discussion under this topic reads in part:

"In some states legislation has been adopted to prohibit annexation by municipalities which are unable to render *reasonable* services to the annexed area. Determination of a municipality's capacity to extend certain services to new areas involves an evaluation of many intangible factors such as prospective city policies relating to slum clearance, health service, welfare relief and sewage coverage. . . ." (Emphasis added.) (House Comm. on Local Government, 1974 minutes, January 16, 1974.)

Analogous statutes in four states support our conclusion that the additional requirements imposed by the 1974 legislative amendment to the Kansas annexation law do not make the legislative standards meaningless.

In Tennessee T. C. A. § 6-309 required that the governing body of a municipality planning to annex shall adopt a *plan of services*

setting forth at a minimum the identification and *projected timing* of municipal services proposed to be extended into the territory proposed to be annexed. In *State v. Town of Madisonville*, 222 Tenn. 272, 435 S. W. 2d 803 (1968) the plan of services was attacked as vague, evasive, wholly inadequate and not complying with T. C. A. § 6-309. There the court noted:

"There is proof in the record services of fire protection, police protection, garbage disposal, erection of street signs, signals and markings would become effective as soon as the annexation ordinance became operative. The matter of extending water and sewer service would be done as soon as it was determined the areas in which the extensions were feasible. Engineering studies were being made for this purpose.

"The record further shows the City had an average bond issuing rating and had no outstanding general obligation bonds which might affect the issuance and sale of bonds to finance the services outlined in the plan of services.

"In view of the testimony relating to the plan of services and the foregoing opinion of this Court, we think the City has complied with T. C. A. Section 6-309 as held by the trial judge." (p. 279.)

It is apparent the Tennessee Supreme Court held the city had complied with the plan of services and projected timing requirement, even though there was no guarantee by the city.

In North Carolina G. S. § 160-453.3 a municipality planning annexation was required to make *plans* for the extension of services to the area proposed to be annexed. *The plans* were *specifically required* to make provision for extending police protection, fire protection, garbage collection, street maintenance, water mains and sewer lines. In *Adams-Millis Corp. v. Kernersville*, 6 N. C. App. 78, 169 S. E. 2d 496 (1969), cert. denied, 275 N. C. 681, 169 S. E. 2d 496 (1969), it was contended the annexation report did not contain adequate plans. The North Carolina Court of Appeals set forth the plans and held they were in substantial compliance with the statute.

Under the North Carolina statute in the case of *In re Annexation Ordinance*, 255 N. C. 633, 122 S. E. 2d 690 (1961) the city made no plan to completely extend water services. This was held improper, the court stating:

". . . The city must furnish major municipal services to areas annexed as provided by the Act. The performance of this duty may not be made to depend upon a doubtful contingency, and may not be delegated to others by the city so as to relieve the city of the duty. . . ." (p. 646.)

The experience of Mississippi must also be noted. M. C. A. § 21-1-27 reads in part:

". . . In the event the municipality desires to enlarge such boundaries, such ordinance shall in general terms describe the proposed improvements to be made in the annexed territory, the manner and extent of such improvements, and the approximate time within which such improvements are to be made; such ordinance shall also contain a statement of the municipal or public services which such municipality proposes to render in such annexed territory. . . ."

In *Ritchie, et al. v. City of Brookhaven,* 217 Miss. 860, 65 So. 2d 436, suggestion of error overruled 217 Miss. 876, 65 So. 2d 832 (1953), the annexing ordinance provided:

" 'Section 3. That the City of Brookhaven shall make the following improvements in said annexed territory:

" 'Grading and drainage of existing streets; *installing water and sewer lines and street lighting where necessary and economically feasible,* said improvements to be completed within a reasonable time not to exceed three years from the effective date of this ordinance, unless delayed by war or military preparedness restrictions; and the said City of Brookhaven shall furnish in said annexed territory the following municipal or public services beginning on the effective date of this ordinance, to wit:

" 'Police protection, fire protection, garbage removal, maintenance of existing streets, and measures for the elimination of, or protection against, mosquitoes and other insects, and water rates reduced to same as charged within City.' " (p. 874.) (Emphasis added.)

The Mississippi Supreme Court held the ordinance substantially complied with the statute despite use of the term "where necessary and economically feasible." (See also, *Ferguson v. Town of Vaiden,* 242 So. 2d 124 [Miss. 1970] [improvements within three years where necessary and economically feasible satisfied statute]; and *Bridges v. City of Biloxi,* 253 Miss. 812, 178 So. 2d 683 [1965], appeal dismissed, 383 U. S. 574, 16 L. Ed. 2d 106, 86 S. Ct. 1077 [1966] [improvements to be completed within a reasonable time not to exceed five years satisfied statute].)

In Indiana, if the evidence establishes that:

"(c) The annexing city has developed a fiscal plan and has established a definite policy to furnish the territory to be annexed within a period of three [3] years, governmental and proprietary services substantially equivalent in standard and scope to the governmental and proprietary services furnished by the annexing city to other areas of the city which have characteristics of topography, patterns of land utilization and population density similar to the territory to be annexed; the court shall order the proposed annexation to take place notwithstanding the provisions of any other law of this state." (Burns Ind. St. Ann. 18-5-10-25.)

It was held in *Harris v. City of Muncie,* _____ Ind. App. _____, 325 N. E. 2d 208 (1975):

"In order to comply with statutory requirement that no land, whether urbanized or undeveloped can be annexed by city unless city has developed fiscal plan and policy to provide services to area, annexing city must have some observable and reviewable program for providing required services and some commitment to implementation of such program." (Syl. ¶ 4, p. 208.)

There the evidence did not show that the City of Muncie had *any* fiscal plan, or definite policy, written or oral, to furnish the requisite services.

Taking into consideration the legislative history of the 1974 amendment to our annexation law, the legislative experience of the four states above reviewed and the fact that the Kansas legislature intended to effectuate some change in the annexation law by the 1974 amendments, it is our opinion the legislature of Kansas intended that a city proposing annexation of territory to the city must first prepare and submit a *bona fide* plan covering each major governmental and proprietary service to be furnished the territory to be annexed substantially equivalent in standard and scope to such governmental and proprietary services furnished by the annexing city to persons and property already located within the municipality at the time of annexation. The plan must include a timetable setting forth when those services will be extended to such annexed area and the method by which the city plans to finance the extension of such services. In this connection, a *bona fide* plan is one which must be prepared and submitted by the city in accordance with the statute in good faith and with honest intentions on the part of the city to implement the plan as submitted.

If the plan submitted is a hoax, which is designed only to accomplish the annexation of territory, the annexation is subject to challenge by any owner of land within the territory annexed by the city on the ground that the city had no statutory authority to annex the territory under these circumstances.

The basic theory underlying the annexation law as it now exists is that the owners of land in the newly annexed territory are entitled within a reasonable time to share in the municipal services and benefits accorded to owners of land in other portions of the municipal territory upon a footing of substantial equality. (2 E. McQuillin, The Law of Municipal Corporation, § 7.46 [3d ed. 1966 rev. p. 518].)

We hasten to add, however, that all municipal services and facilities are subject to economic, political and other practical contingencies and vicissitudes, too numerous to mention, over which a

municipality has no absolute and complete control. Limitations and restrictions are imposed by other statutory and regulatory provisions, both state and federal, which mandate changes and modifications in the plans and timetables of municipalities. A municipality cannot know what fortune or misfortune time will bring. For these reasons the "plan" and "timetable" of a municipality cannot be a "guarantee" to the owner of land in the proposed area of annexation. Our rule has always been that substantial compliance with an annexation statute is all that can be required. ( *City of Kansas City v. Board of County Commissioners*, 213 Kan. 777, 518 P. 2d 403.) Action taken by the City in the annexation of territory, however, must be done in good faith.

## II

Does the City's plan substantially comply with the statutory requirement of K. S. A. 12-519, *et seq.*, as amended in 1974?

Mr. Lakin, the City's representative, on cross-examination at the trial, referred to various provisions of the plan "as policy statements and not guarantees", indicating that the City policy could change and the timetable become inaccurate. The appellants seize upon these statements to argue the City has not committed itself to a plan.

Taken as a whole, however, the evidence demonstrates compliance with the annexation statute as amended. The plan and the timetable comprehensively covered essential municipal services. Although the timing for some services was listed as "when petitioned for by owners", the record indicates this to be consistent with the City of Wichita's policy in connection with provision for similar services and improvements to others within the City.

This procedure has been specifically approved by the Kansas Legislature in the general improvement and assessment law. ( K. S. A. 1974 Supp. 12-6a01, *et seq.* ) We find substantial evidence in the record to support the trial court's conclusion that a *bona fide* plan has been submitted by the City.

## III

Does the annexation via two ordinances substantially comply with the statute?

Although the City of Wichita declared its interest in annexing the tracts in question in one resolution, it annexed the area via two ordinances. The appellants rely on *State, ex rel., v. City of Overland Park*, supra, and argue the annexation statute must be strictly

applied by the annexing city. The appellants misconstrue this *Overland Park* case which held:

"The basic function of the courts is to determine whether a city has statutory authority for its action in annexing land and *whether it has acted within its authority in adopting an ordinance for that purpose.*" (Syl. ¶ 5.) (Emphasis added.)

Whether a city has acted within its authority in adopting an annexation ordinance is determined by a substantial compliance test. (*City of Kansas City v. Board of County Commissioners*, supra; and *Sabatini v. Jayhawk Construction Co.*, supra.) In *Sabatini* the Jayhawk Construction Company filed a petition for annexation after entering into a purchase contract but before the deed showing their ownership was filed of record. Under the annexation ordinance the written petition for annexation was to be filed by the "owner". There the appellants contended since Jayhawk did not hold record title at the time the petition was filed, the petition and all subsequent proceedings were defective and void. This contention was rejected by the court which held there was substantial compliance with the statute—compliance consistent with the purpose of the statute.

Here the City of Wichita has substantially complied with the statute by annexing the whole of the territory set forth in their resolution. The purpose of the statute is to protect the rights of the landowners against unilateral action by a city in annexing their land. Under this section, notice of the City's intention to annex, and an opportunity to be heard is required. These procedures were fulfilled by the City. The City gave sufficient notice to the landowners to protest, and the City Commission conducted hearings on two separate occasions for three hours on each occasion to hear the landowners and to inform them. The decision to annex via two ordinances came from administrative procedures of long-standing which were not aimed at, and in no way prejudiced, the appellants.

### IV

Did the court err in not considering the question of unfairness or unreasonableness of the annexation by the City?

The problem encountered in giving a definite answer to this question involves semantics.

The rule to which this court adheres was stated in *State, ex rel., v. City of Overland Park*, 192 Kan. 654, 391 P. 2d 128, where the court held:

"The wisdom, necessity or advisability of annexing territory to cities is not a matter for consideration by the courts. The basic function and duty of the courts is to determine whether a city has statutory authority and whether it has acted thereunder in passing an annexation ordinance." (Syl. ¶ 3.)

In *Sabatini v. Jayhawk Construction Co.,* supra, the foregoing rule was paraphrased as:

"It is not a proper judicial function for a court to inquire into the *reasonableness,* wisdom, necessity or advisability of annexing and platting land. . . ." (p. 413.) (Emphasis added.)

In *State, ex rel., v. City of Overland Park,* 215 Kan. 700, 527 P. 2d 1340, the court said:

"The state cites a number of cases in which annexation attempts have been found to violate constitutional guarantees. In large part they represent extreme situations of *grossly unreasonable action.* For example, in *Batchelder v. City of Coeur D'Alene,* 85 Idaho 90, 375 P. 2d 1001, the annexation would have bisected a landowner's business property, putting part of it inside and part outside the city. In *State ex rel. Davis v. City of Stuart,* 97 Fla. 69, 120 So. 335, the land annexed increased the city area fifteen times and was essentially wilderness with little possibility of development. The situation here is not comparable." (p. 710.) (Emphasis added.)

A careful study of our cases illustrates that the court does recognize the "reasonableness" of action taken by a city in connection with annexation as a viable issue, where the action taken by a city is found to violate constitutional guarantees. The same could be said if the action taken by a city in connection with annexation is found to exceed statutory authorization.

It may fairly be said in this case the wisdom, necessity or advisability of annexing the three areas in question by the City of Wichita is not a matter open for challenge by the appellants in court.

The 1974 legislative amendment allowing any owner of land annexed by the city to "challenge the authority of the city to annex such lands and the regularity of the proceedings had in connection therewith" changes our prior law only to the extent that it is no longer necessary that an action protesting an annexation be brought in the name of the state.

The amended law under consideration provides for notice to the persons affected. That notice is designed to be adequate to inform the affected landowners of the municipality's decision, what benefits they will receive and what cost they will incur. Through this notice and the hearing procedure afforded, the affected landowner may attempt to persuade the City that annexation would not be in

the best interest of either party. The court, however, does not examine the wisdom, necessity or advisability of the annexation.

The appellants' proffer of evidence relates to matters discretionary in nature involving economic and political considerations entrusted to the governing body of the City and is outside judicial cognizance and thus the trial court properly excluded it. (*State, ex rel., v. City of Overland Park*, 215 Kan. 700, 527 P. 2d 1340.)

The judgment of the lower court is affirmed.