UNITED STATES of America, Plaintiff,

v.

CITY OF LEAVENWORTH, KANSAS, State Corporation Commission of Kansas, comprised of G. T. Vanbebber, William F. Gray, and R. C. Loux, and the Kansas Power and Light Company, Defendants.

Civ. A. No. 77–2214.

United States District Court, D. Kansas.

Dec. 21, 1977.

James P. Buchele, U. S. Atty., Topeka, Kan., M. Carr Ferguson, John J. McCarthy and William L. Shraberg, Attys., U. S. Dept. of Justice, Washington, D. C., for the Tax Division.

Robert D. Beall, City Atty., Leavenworth, Kan., for defendant, City of Leavenworth, Kansas.

Thomas J. Pitner, Gen. Counsel, Topeka, Kan., for defendant, State Corp. Commission of Kansas, etc.

John J. Jurcyk, Jr., of McAnany, Van Cleave & Phillips, Joseph J. Kelly, Jr. and Basil W. Kelsey, Spencer, Fane, Britt & Browne, Kansas City., Mo., for defendant, Kansas Power & Light Co.

## MEMORANDUM AND ORDER

O'CONNOR, District Judge.

The parties herein having agreed to a temporary restraining order dated September 7, 1977, this matter is now before the court for determination of the plaintiff's motion for a preliminary injunction. The question to be resolved is whether the Department of the Army and the Bureau of Prisons have sovereign immunity by virtue of their status as agencies of the United States from exactions sought to be collected by the defendant Kansas Power & Light Company, a public utility that provides electricity to the Ft. Leavenworth Army installation and the United States Penitentiary in Leavenworth, Kansas. After examining the relevant cases in this somewhat murky area of the law, the court concludes for reasons more fully set forth below that the exactions in question do not constitute an impermissible interference with the sovereignty of the federal government.

Principally for this reason, the plaintiff's motion for a preliminary injunction must be overruled.

 The doctrine of sovereign tax immunity, *i. e.,* that both federal and state governments and their respective instrumentalities are immune from taxation by each other, does not arise from any express constitutional prohibition. Rather, it rests upon "an implied limitation on the taxing power of each, such as to forestall undue interference, through the exercise of that power, with the governmental activities of the other." *Graves v. New York ex rel. O'Keefe,* 306 U.S. 466, 477–78, 59 S.Ct. 595, 597, 83 L.Ed. 927 (1938); *Willcuts v. Bunn,* 282 U.S. 216, 231, 51 S.Ct. 125, 75 L.Ed. 304 (1930). While it has been observed that "the line between the taxable and the immune has been drawn by an unsteady hand," *United States v. Allegheny County,* 322 U.S. 174, 176, 64 S.Ct. 908, 910, 88 L.Ed. 1209 (1943), the fundamental principle first announced in *McCulloch v. Maryland,* 4 Wheat. (U.S.) 316, 4 L.Ed. 579 (1819), has remained unimpaired: the possessions, institutions, and activities of the federal government, in the absence of congressional consent, are not subject to any form of state taxation. This principle is more easily stated than applied, however, and in determining whether a tax is actually laid on the United States or its property, the court must "[go] beyond the bare face of the taxing statute to consider all relevant circumstances." *United States v. City of Detroit,* 355 U.S. 466, 469, 78 S.Ct. 474, 476, 2 L.Ed.2d 424 (1957). Relevant considerations include not only the particular facts of the case before the court, but extend to competing philosophies inherent in our federal scheme of government. The following cogent observation of the Supreme Court in *Helvering v. Gerhardt,* 304 U.S. 405, 417, 58 S.Ct. 969, 974, 82 L.Ed. 1427 (1937), while pertaining to state immunity from federal taxation, is thus equally applicable to the situation before us:

"[I]f every federal tax which is laid on some new form of state activity, or whose economic burden reaches in some measure the state or those who serve it, were to be set aside as an infringement of state sovereignty, it is evident that a restriction upon national power, devised only as a shield to protect the states from curtailment of the essential operations of government which they have exercised from the beginning, would become a ready means for striking down the taxing power of the nation."

On the other hand, as the Supreme Court noted in *Willcuts v. Bunn,* 282 U.S. at 225, 51 S.Ct. at 127, to preserve the essential powers of either the state or the federal government, it is not necessary to cripple the other's power to tax "by extending the constitutional exemption from taxation to those subjects which fall within the general application of non-discriminatory laws, . . where no direct burden is laid upon the governmental instrumentality, and there is only a remote, if any, influence upon the exercise of the functions of government." *See, also, Helvering v. Producers Corp.,* 303 U.S. 376, 385, 58 S.Ct. 623, 627, 82 L.Ed. 907 (1937).

■ In considering the immunity of federal instrumentalities from state taxation two factors lacking in a case of a claimed state immunity from federal taxation may be of importance. Since the acts of Congress within its constitutional power are supreme, "the validity of state taxation of federal instrumentalities must depend (a) on the power of Congress to create the instrumentality and (b) its intent to protect it from state taxation." *Helvering v. Gerhardt,* 304 U.S. at 411 n. 1, 58 S.Ct. at 971. As to the latter point it is well established that Congress may curtail an immunity which might otherwise be implied by authorizing state taxation of federal instrumentalities. *Id.* Likewise Congress may protect its agencies from the burdens of local taxation and may enlarge an immunity beyond the point where, Congress being silent, the Constitution would set its limits. *Mayo v. United States,* 319 U.S. 441, 446, 63 S.Ct. 1137, 87 L.Ed. 1504 (1942). Where Congress has given "no intimation of any purpose either to grant or withhold immunity from state taxation," however, "there is no basis for implying a purpose of Congress to exempt the federal government or its agencies from tax burdens which are unsubstantial or which courts are unable to discern." *Graves v. New York ex rel. O'Keefe,* 306 U.S. at 479, 480, 59 S.Ct. at 598. In these circumstances "it is in order to consider the nature and effect of the alleged burden, and if it appears that there is no ground for implying a constitutional immunity, there is

equally a want of any ground for assuming any purpose on the part of Congress to create an immunity." *Id.* at 480, 59 S.Ct. at 598.

■ The Supreme Court has long held state taxation that imposes a "direct" burden on the federal government to be invalid. Whether a particular state's "money exaction," "tax," or "enforced contribution to provide for the support of government," *e. g., Mayo v. United States,* 319 U.S. at 447, 63 S.Ct. 1137; *United States v. La-Franca,* 282 U.S. 568, 572, 51 S.Ct. 278, 75 L.Ed. 551 (1931), presents a direct obstruction to the exercise of federal power does not depend, however, upon the nature of the federal agency, the mode of its operation, or the fact that it is a federal governmental agency. Rather, the question is "whether the tax does in truth deprive [federal agencies] of power to serve the government as they were intended to serve it, or does hinder the effective exercise of their power." *Railroad Company v. Peniston,* 18 Wall. 5, 36, (85 U.S.) 21 L.Ed. 787 (1873); *James v. Dravo Contracting Co.,* 302 U.S. 134, 154, 58 S.Ct. 208, 82 L.Ed. 155 (1937). Under this test the Supreme Court has invalidated state taxes upon branches of the national bank, *McCulloch v. Maryland,* 4 Wheat. (U.S.) 316, 4 L.Ed. 579 (1819); stock issued for loans to the United States, *Weston v. Charleston,* 2 Pet. (27 U.S.) 449, 7 L.Ed. 481 (1829); offices of the United States, *Dobbins v. Commissioners,* 16 Pet. (41 U.S.) 435, 10 L.Ed. 1022 (1842); telegraph messages sent by officers of the United States on official business, *Telegraph Company v. Texas,* 105 U.S. 460, 26 L.Ed. 1067 (1881); the business of telegraphy, part of which was a federal governmental agency, *Williams v. Talladega,* 226 U.S. 404, 33 S.Ct. 116, 57 L.Ed. 275 (1912); federal government leases, *Indian Territory Illuminating Oil Co. v. Oklahoma,* 240 U.S. 522, 36 S.Ct. 453, 60 L.Ed. 779 (1921); mortgages executed to the United States, *Federal Land Bank v. Crosland,* 261 U.S. 374, 43 S.Ct. 385, 67 L.Ed. 703 (1922); the property of a corporate instrumentality of the United States, *Clallam County v. United States,*

263 U.S. 341, 44 S.Ct. 121, 68 L.Ed. 328 (1923); federally-owned fertilizer shipped into state under a federal soil conservation program, *Mayo v. United States,* 319 U.S. 441, 63 S.Ct. 1137, 87 L.Ed. 1504 (1942); machinery owned by United States, *United States v. Allegheny County,* 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1943); the sale of property to contractor acting as agent of United States, *Kern-Limerick, Inc. v. Scurlock,* 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546 (1953); the sale of property to a national bank, *First Agricultural National Bank v. State Tax Commission,* 392 U.S. 339, 88 S.Ct. 2173, 20 L.Ed.2d 1138 (1967); and the sale of liquor to officers' clubs and post exchanges on federal military installations, *United States v. Tax Commission of Mississippi,* 421 U.S. 599, 95 S.Ct. 1872, 44 L.Ed.2d 404 (1974). In all of these cases, the incidence of the proscribed exaction was found to be upon the property, officers, contracts, or instrumentalities of the federal government. The tax was therefore prohibited by the supremacy clause of the federal Constitution.

 The federal government's right to be free of direct taxation by the state does not, however, spell immunity from paying the added costs attributable to the taxation of those who furnish supplies and services to the United States and who have been granted no tax immunity. *Alabama v. King & Boozer,* 314 U.S. 1, 9, 62 S.Ct. 43, 86 L.Ed. 3 (1941). Such a tax *may* be invalid even though it does not fall directly on the United States "if it operates so as to discriminate against the Government or those with whom it deals." *United States v. City of Detroit,* 355 U.S. 466, 473, 78 S.Ct. 474, 478, 2 L.Ed.2d 424 (1957). However, an indirect tax that is non-discriminatory, *i. e.* "but a normal incident of the organization within the same territory of two independent taxing sovereignties," *Alabama v. King & Boozer,* 314 U.S. at 9, 62 S.Ct. at 45, and that "does not interfere in any substantial way with the performance of federal functions," *James v. Dravo Contracting Co.,* 302 U.S. at 161, 58 S.Ct. at 221, may be a perfectly valid exaction. In determining whether a state tax falls within the category of permissible exactions, the court is concerned "only with its practical operation, not its definition or the precise form of descriptive words which may be applied to it." *Lawrence v. State Tax Commission,* 286 U.S. 276, 280, 52 S.Ct. 556, 557, 76 L.Ed. 1102 (1932). Thus, in determining "the real nature of the tax and its effect upon the federal right asserted," *Carpenter v. Shaw,* 280 U.S. 363, 367–68, 50 S.Ct. 121, 123, 74 L.Ed. 478 (1930), the court must look "through form and behind labels to substance." *City of Detroit v. Murray Corp.,* 355 U.S. 489, 492, 78 S.Ct. 458, 460, 2 L.Ed.2d 441 (1957). Careful attention must therefore be directed to all of the facts and circumstances pertaining to a challenged exaction.

The instant action was instituted by the United States for the purpose of obtaining a declaratory judgment barring the City of Leavenworth, Kansas, from assessing and collecting "exactions" by reason of the furnishing of electricity, gas, and telephonic services to agencies of the United States, and ordering a refund of amounts previously paid by the United States. The "exactions" of which the United States complains arise from Leavenworth's City Ordinance No. 5493, effective August 23, 1963. That ordinance embodied the terms of an exclusive franchise agreement between the City and the Kansas Power & Light Company whereby the latter was granted the right, privilege, and authority for 20 years to occupy and use the public places of said city "for the placing and maintaining of equipment and property necessary to carry on the business of selling and distributing electricity for all purposes to the City of Leavenworth, Kansas, and its inhabitants, and through said City and beyond the limits thereof." Section 2 of the ordinance provided that in consideration for the granting of said franchise, "and in lieu of any city occupation license, or revenue taxes," Kansas Power & Light was obligated to pay to the City "three percent (3%) of its gross revenue from the sale of electric energy to all customers within the corporate limits of said City." Municipal authority to grant

this franchise was expressly conferred by state statute. K.S.A. §§ 12–824 and 12–2002. At the time Ordinance No. 5493 was enacted, the Fort Leavenworth military installation and the United States Penitentiary were located beyond the city limits of Leavenworth. The ordinance therefore had no specific application to these governmental agencies.

Kansas Power & Light, a regulated public electricity utility, was and is subject to the exclusive and intensive regulatory authority of the Kansas State Corporation Commission. The Commission's authority includes the power to prescribe rates and, in cases where it finds unjustly discriminatory rates, to substitute such other charges as are just and reasonable. K.S.A. § 66–110. At approximately the same time that the City of Leavenworth passed Ordinance No. 5493, the Commission became concerned with the discriminatory implications of a particular regulatory policy then in effect, governing the manner in which the costs of municipal franchise fees were passed on to the ultimate consumers of a given utility. The prescribed service areas of individual public utilities encompassed numerous cities which had taken various positions regarding whether, and at what rate, a municipal franchise fee would be imposed. Nevertheless, the Commission had authorized public utilities to pass on as "hidden costs" to all customers within the boundaries of their respective service areas the financial burden occasioned by the franchise fees of particular cities. Thus even if a customer did not live in a city that exacted and benefitted from a franchise fee, he was required to contribute equally with customers who did. Under this rate formulation the federal prison and the military installation—both located outside the boundaries of any incorporated municipality—bore the franchise fee burden of not only Leavenworth, but all cities exacting franchise fees within the entire territory served by Kansas Power & Light. In order to remedy the discrimination inherent in such a policy, the Commission in 1966 ordered that in the future all franchise fees must be directly charged on a *pro rata* basis to only such utility customers

as lived within the municipal boundaries of the city exacting the fee. The Commission further ordered that each customer's bill reflect as a separate item his *pro rata* share of any pertinent franchise fee.

These events set the stage for the instant controversy, for in 1977, when the City of Leavenworth annexed the property on which Fort Leavenworth and the federal penitentiary are located, the federal agencies were presented by Kansas Power & Light with electricity bills to which a three percent franchise fee was added. The Bureau of Prisons refused payment of the fee on the ground that it was an impermissible tax upon the federal government. The Department of the Army, after making payments for the period from April 21, 1977, to June 20, 1977, likewise refused further payments on the ground of constitutional immunity from state taxation.

■■■ All parties agree that the critical question to be resolved is whether the incidence of the City's franchise fee falls upon agencies and instrumentalities of the United States or whether it falls upon a third party doing business with the United States, Kansas Power & Light. The distinction between taxation of private interests and taxation of governmental interests is "fundamental in application of the immunity doctrine as developed in this country," *United States v. Allegheny County,* 322 U.S. at 186, 64 S.Ct. at 915.

■■■ It is much easier to determine what factors are *not* controlling in determining where the incidence of a particular tax lies than it is to ascertain what factors under the Supreme Court decisions *are* controlling on that issue. For example, the Supreme Court has "squarely rejected" the proposition that the legal incidence of a tax falls always upon the person legally liable for its payment. *First Agricultural National Bank v. Tax Commission,* 392 U.S. 339, 88 S.Ct. 2173, 20 L.Ed.2d 1138 (1968); *United States v. Mississippi Tax Commission,* 421 U.S. 599, 95 S.Ct. 1872, 44 L.Ed.2d 404 (1974). Further, the decision as to where the legal incidence of a tax falls is not

determined by who bears the ultimate economic burden thereof. *E. g., Gurley v. Rhoden,* 421 U.S. 200, 204, 207, 95 S.Ct. 1605, 44 L.Ed.2d 110 (1974). These factors, however, together with considerations as to (1) the legislative history of the tax and the intent of the taxing authority; (2) the rights and obligations of the parties to the transaction on which the tax is imposed; and (3) whether the economic burden of the tax, if imposed on a non-governmental agency, is required to be passed on to the United States, must be weighed into the court's determination. It has been held on numerous occasions that a sales tax which by its terms must be passed on to the purchaser imposes the legal incidence of the tax upon the purchaser. *United States v. Tax Commission of Mississippi, supra; First Agricultural National Bank v. State Tax Commission, supra; Kern-Limerick, Inc. v. Scurlock, supra; Alabama v. King & Boozer, supra.* Further, it has been held that the incidence of a general ad valorem tax measured in part by the value of federally-owned property in the custody of the taxpayer/bailee is upon the United States. *United States v. Allegheny County, supra.* In a wide variety of other cases, however, the Supreme Court has found the incidence of "license," "privilege," "franchise," and "use" fees or taxes to be upon a government contractor—even though the financial burden of payment thereof was shifted to the agencies or instrumentalities of the United States. *E. g., James v. Dravo Contracting Co., supra* (two percent gross receipts tax on privilege of engaging in business of contracting within state); *Wilson v. Cook,* 327 U.S. 474, 66 S.Ct. 663, 90 L.Ed. 793 (1945) (privilege or license tax on privilege of severing timber from soil, fixed at seven cents per thousand feet of timber severed); *Esso Standard Oil Co. v. Evans,* 345 U.S. 495, 73 S.Ct. 800, 97 L.Ed. 1174 (1952) (special privilege tax on privilege of engaging in business as gasoline distributor, based upon flat fee for each gallon used, distributed, or stored); *United States v. City of Detroit, supra* (tax on privilege of using *ad valorem* tax-exempt real property in profit-making business, computed in

same manner and at same rate as *ad valorem* taxes on non-exempt property); *City of Detroit v. Murray Corp., supra* (tax on private party's privilege of using personal property owned by federal government for taxpayer's personal profit, measured by value of government property possessed); *Polar Ice Company v. Andrews,* 375 U.S. 361, 84 S.Ct. 378, 11 L.Ed.2d 389 (1963) (tax on privilege of engaging in business of distributing milk within state measured by amount of milk distributed).

 In the court's view the City of Leavenworth franchise fee does not fall directly upon the property, agents, instrumentalities, or purchases of the United States. Legal liability for payment of the exaction to the City falls upon Kansas Power & Light; Ordinance No. 5493 contains no provisions for collection directly from the United States, nor does it purport to authorize any procedures whereby penalties for nonpayment—such as liens or encumbrances upon government property—may be sought against the United States property or its treasury. Furthermore, so far as the City's interest in collection is concerned, there is no requirement that Kansas Power & Light pass on to the United States all or any part of the financial burden of the franchise fee. The franchise fee is laid upon the privilege extended to Kansas Power & Light to use public property in the City for business purposes and to sell electricity to municipal residents. Although the franchise fee is computed as a percentage of gross receipts received from the sale of electricity, and is thus perhaps analogous to a "sales tax" in terms of its measurement, the similarity between the instant franchise fee and a sales tax goes no further. Ordinance No. 5493 clearly grew out of no effort to tax sales to the final consumer. The fact that the city franchise fee burden is passed on economically "by the terms of the contract or otherwise," *Curry v. United States,* 314 U.S. 14, 18, 62 S.Ct. 48, 49, 86 L.Ed. 9 (1941); *Alabama v. King & Boozer, supra,* is not determinative of the incidence of the tax. See *Polar Ice Co. v. Andrews, supra.* Nor does the fact that the

United States may be required under Kansas State Corporation Commission orders to reimburse Kansas Power & Light for a *pro rata* share of the franchise fee alter the incidence of the tax as originally laid. *Alabama v. King & Boozer,* 314 U.S. at 12, 62 S.Ct. 43.

 Having found that the incidence of the challenged tax falls upon Kansas Power & Light, a third party contracting with or providing services to the United States, rather than falling directly upon the federal government, the City's franchise fee must be sustained unless it is found to be discriminatory or to unduly interfere with the sovereignty of the United States. There is no question of the City's lawful authority under state law to promulgate Ordinance No. 5493, nor of the reasonableness of the fee. The record contains no hint that enactment of the franchise fee was in any way intended to discriminate, or applied in such a way as to discriminate, against any agencies or instrumentalities of the federal government. Indeed the record indicates that the ordinance was passed some 14 years before annexation of the federal properties in question. Further, assessment of a *pro rata* share of the franchise fee to the Department of the Army and the Bureau of Prisons can be most accurately viewed not as an act of discrimination against the sovereign operations of the United States, but as an effort to remove an otherwise discriminatory tax burden from the general populace of the City of Leavenworth by requiring two significant federal electricity consumers to shoulder their fair share of Kansas Power & Light's supply costs.

 In the court's view the nondiscriminatory franchise fee in question poses no such "tangible or certain economic burden on the government concerned" as would warrant an implication of constitutional tax immunity. See *Graves v. New York ex rel. O'Keefe,* 306 U.S. at 486, 59 S.Ct. at 601. In *Graves* the Supreme Court stated that "the only possible basis for implying a constitutional immunity . . . is that the economic burden of the tax is in some way passed on so as to impose a burden on the national government tantamount to an interference by one government with the other in the performance of its functions." 306 U.S. at 481, 59 S.Ct. at 598. Similarly, the Supreme Court in *James v. Dravo Contracting Co., supra,* held that the immunity of federal agencies from state taxation depends upon whether "the tax does in truth deprive them of power to serve the government as they were intended to serve it, or does hinder the efficient exercise of their power." 302 U.S. at 154–55, 58 S.Ct. at 218. The "burden" alleged to constitute the basis for implied immunity must be "real, not imaginary; substantial, not negligible." *Willcuts v. Bunn,* 282 U.S. 216, 51 S.Ct. 125, 130, 75 L.Ed. 304 (1930); see also, *Helvering v. Producers Corp.,* 303 U.S. 376, 385, 58 S.Ct. 623, 82 L.Ed. 907 (1937). Further, the actual tax consequences alleged to constitute an appreciable burden must be capable of some degree of demonstration and proof, for in most cases such burdens cannot be ascertained by the "inadequate guidance of judicial notice." *Willcuts v. Bunn,* 282 U.S. at 230, 51 S.Ct. 125. As the Supreme Court stated in *Helvering v. Producers Corp.,* 303 U.S. at 386–87, 58 S.Ct. at 628:

> "[I]mmunity from non-discriminatory taxation . . . cannot be supported by merely theoretical conceptions of interference with the functions of government. Regard must be had to substance and direct effects. And where it merely appears that one operating under a government contract or lease is subjected to a tax with respect to his profits on the same basis as others who are engaged in similar businesses, there is no sufficient ground for holding that the effect upon the Government is other than indirect and remote."

In this case, the only demonstrated "burden" inflicted upon the United States is the fact that the overall costs of operating Ft. Leavenworth and the U. S. Penitentiary will increase by some small undetermined amount. This is not a case involving "discrimination against the Federal Government, its property or those with whom it

does business," a "crippling obstruction of any of the Government's functions," or a "sinister effort to hamstring its power." *City of Detroit v. Murray Corp.*, 355 U.S. at 495, 78 S.Ct. at 462. In these circumstances the fact that the United States will eventually bear the financial cost of the franchise fee does not create an unconstitutional burden, for "the one principle in this area which has heretofore been clearly settled is that the imposition of an increased financial burden on the Government does not by itself invalidate a state tax." *Id.* at 494, 78 S.Ct. at 461. Stated otherwise, "[t]he fact that the expenses of the one government might be lessened if all those who deal with it were exempt from taxation by the other" is not an adequate basis for an implication of constitutional tax immunity. *Graves v. New York ex rel. O'Keefe*, 306 U.S. at 483 n. 3, 59 S.Ct. at 600.

For all of the above reasons, the court concludes that the incidence of the City of Leavenworth franchise fee does not fall upon the United States and that, even though the financial burden of this non-discriminatory exaction is passed along to the United States in the form of increased costs for electricity consumed at the Ft. Leavenworth and United States Penitentiary facilities, the remote and indirect burden so inflicted upon the federal government does not render the franchise fee invalid under the implied constitutional doctrine of sovereign tax immunity. We must now turn to the contention of the United States that even if the franchise fee is constitutionally valid as indirectly applied to the federal government, said fee is inapplicable because Kansas Power & Light's sale of electricity is not to an "inhabitant" of the City of Leavenworth. Thus Ordinance No. 5493, it is argued, has no application to sales of electricity to the federal facilities in question.

■ This argument hinges upon the validity of the purported annexation of the federal properties by the City of Leavenworth on April 18, 1977. K.S.A. § 12–520(c) allows the governing body of any city in Kansas to annex by ordinance any land that "adjoins the city and is owned by or held in trust for any government unit other than another city." K.S.A. § 12–520b provides that "[t]he governing body of any city proposing to annex land under the provisions of K.S.A. 12–520 shall make plans for the extension of services to the area proposed to be annexed and shall, prior to the adoption of the resolution provided for in K.S.A. 12–520a, prepare a report setting forth such plans." Said plan must describe the area proposed to be annexed, the general land use, existing streets, water mains, sewers, utility lines, and proposed extensions thereof. K.S.A. § 12–520b(a)(1)–(3). It must also include a "statement setting forth the plans of the city for extending to the area to be annexed each major municipal service provided to persons and property located within the city at the time of annexation, setting forth the method by which the city plans to finance the extension of such services to such area," as well as a "timetable of the plans for extending each major municipal service to the area annexed." This plan must be presented at a public hearing at which all interested persons must be given an opportunity to be heard prior to enactment of the proposed annexation ordinance. K.S.A. § 12–520a(d). After annexation occurs, any owner of land annexed has 30 days within which to bring an action in the state district court of the county in which such land is located, "challenging the authority of the city to annex such lands and the regularity of the proceedings had in connection therewith." K.S.A. § 12–520. One recognized basis on which the annexation may be challenged is that the city's plan for the extension of municipal services was not a *bona fide* plan "prepared and submitted in accordance with the statute in good faith and with honest intentions on the part of the city to implement the plan as submitted," but was rather a "hoax" designed "only to accomplish the annexation of territory." *Clarke v. City of Wichita*, 218 Kan. 334, 346, 543 P.2d 973, 985 (1975).

The property on which the Ft. Leavenworth military installation and the United States Penitentiary are located was an-

nexed to the City of Leavenworth in the following manner: On December 14, 1976, the City of Leavenworth governing body passed a resolution providing for a public hearing on February 15, 1977, to consider annexation of the federal property in question. Copies of said resolution were sent by certified mail to the Chief of Staff at Ft. Leavenworth and to the Warden of the Penitentiary. In order to have additional time to evaluate the ramifications of the proposed annexation, each of these officials requested the City to continue the public hearing until April 15, 1977. Pursuant to these requests, the City rescheduled the hearing for April 5, 1977. At that meeting, which was not attended by representatives from either federal agency, the City Manager of Leavenworth presented the City's plan for the extension of municipal services to the area proposed to be annexed. After some discussion, the annexation ordinance was considered for the first time. Thereafter, at another meeting on April 12, 1977, the annexation ordinance was unanimously adopted by the City's governing body. The United States made no effort to seek judicial review of the City's authority to annex its property within the 30 days provided by K.S.A. § 12–520, either in the state district court in the county in which the annexed property was located or elsewhere.

The City's "plan for the extension of municipal services was properly filed and presented in accordance with K.S.A. §§ 12–520a and 12–520b. The tenor of the report was that all major municipal services that were generally provided by the City of Leavenworth (street maintenance, water and sewer services, fire and police protection, parks and recreation, and "others") were already fully provided by the federal government to the area sought to be annexed. The plan acknowledged that the property was "totally and completely controlled" by the Bureau of Prisons and the Department of the Army and that such property was exempt from any state, county, or city control or regulation. In view of the fact that all municipal-type services were already being provided to the property in question and the further fact that the City saw itself as legally precluded from asserting any jurisdiction whatsoever over that property, the City's curious "plan for the extension of municipal services" was to maintain the *status quo*. The plan frankly acknowledged that the City had no intention of extending any additional services and conversely, that it would have no regulatory, taxing, or other municipal dominion in the area to be annexed. Indeed, it appears that the sole reason for the annexation was the belief of the City fathers of Leavenworth such action would make the City eligible for an additional $20,000–$35,000 annually in general revenue-sharing funds and other potential future federal grants.

The United States argues that this "plan" prepared by the City of Leavenworth was an insufficient predicate for annexation because of its failure to project the extension of any major municipal services to the area purportedly annexed. It further argues that the requirements of K.S.A. §§ 12–520a and 12–520b that the City prepare and present a "plan" evidence a statement of substantive law that unless a city plans to benefit the area to be annexed by extending major municipal services thereto, it lacks statutory authority to consummate the annexation contemplated. It is important to note that this "*quid pro quo*" argument is based solely upon the language of the Kansas statutes. The United States does not contend that constitutional standards of substantive due process have any application to the validity of the challenged annexation. Nor does it contend that the City's franchise fee is unconstitutional because it purports to tax transactions consummated in a federal enclave subject to the exclusive jurisdiction of the United States and thus beyond the territorial jurisdiction of the City of Leavenworth. *Cf. Ft. Leavenworth R. R. Co. v. Lowe*, 114 U.S. 525, 55 S.Ct. 995, 29 L.Ed. 264 (1884); *Standard Oil v. California*, 291 U.S. 242, 54 S.Ct. 381, 78 L.Ed. 775 (1933); *Wilson v. Cook*, 327 U.S. 474, 66 S.Ct. 663, 90 L.Ed. 793 (1945); *Polar Ice Cream & Creamery Co. v. Andrews*, 375 U.S. 361, 84 S.Ct. 378, 11 L.Ed.2d 389 (1963).

■ In view of the court's holding above that as a matter of law the City's franchise fee imposes no direct, unconstitutional burden upon the United States, the availability of the temporary injunctive relief sought by the plaintiff turns largely upon the court's view of this annexation issue. It is well settled that the burden of proving entitlement to preliminary injunctive relief rests upon the plaintiff in this case and that such relief may be granted only if the United States can establish (1) that it will probably prevail when the merits are tried; and (2) that it will suffer irreparable injury if the injunction is not granted. *E. g., Penn v. San Juan Hospital, Inc.,* 528 F.2d 1181 (10th Cir. 1975); *Crowther v. Seaborg,* 415 F.2d 437 (10th Cir. 1969).

As to the first consideration, the plaintiff here has demonstrated no substantial likelihood that it will prevail in its collateral attack upon annexation Ordinance No. 5493. First, there is room for considerable doubt as to whether the United States is entitled to be heard on the merits of its *"quid pro quo"* argument. As noted above, K.S.A. § 12–520 provides the exclusive procedure by which an affected landowner may challenge a city's authority to annex his land and the regularity of the proceedings had in connection therewith. That procedure is for him to bring an action (1) in the district court of the county in which such land is located (2) within 30 days following publication of the annexation ordinance. The United States has cited general authority to the effect that state law as to available forums, statutes of limitations, and laches is not binding upon the sovereign federal government, and it takes the position that it may litigate the validity of the annexation at any time and in any forum having jurisdiction over the parties. Even assuming that Kansas could not bind the United States to litigate in the statutorily prescribed forum, the court is not persuaded at this time that the 30-day time limitation of K.S.A. § 12–520 may be so cavalierly disregarded.

■ An individual's right to judicial review of city annexation proceedings does not exist at common law because under the separation of powers doctrine, direct judicial review of legislative functions does not exist absent a statute authorizing the same. *City of Kansas City v. Board of County Commissioners,* 213 Kan. 777, 518 P.2d 403 (1974). Therefore, if the United States is to be heard on its claim that the purported annexation was invalid—not because of constitutional reasons or other assertions based in the federal law, but because of the city's noncompliance with a relevant state statute—its right to judicial review must derive from the relevant state statute, subject to the conditions and limitations prescribed therein. While the United States views the 30-day time period for commencement of suit as an "outrageously short," nonbinding statute of limitations, it may also be viewed in another light: *i. e.* that the State of Kansas, having created by statute a new right of judicial review, may make enforcement of that right within a time also fixed by statute a condition precedent to the very right created. *E. g., Denver & R. G. R. Co. v. United States,* 241 F. 614 (8th Cir. 1917); *United States v. Harpootlian,* 24 F.2d 646 (2nd Cir. 1928). The logic of the latter view might be viewed as particularly compelling in cases dealing with annexation or other issues of municipal incorporation and organization, where the potential for chaos wrought by postponed or dilatory challenges is great. Furthermore, even if the 30-day time period of K.S.A. § 12–520 were viewed merely as a statute of limitations inapplicable to actions brought by the United States in its sovereign capacity, it is arguable that this is not such a suit. It has been held that when the United States comes in to court merely as a landowner asserting a property right conferred by state law, its rights are no greater and no less than, but precisely the same as, those of other landowners subject to the relevant law. See *Denver & R. G. R. Co. v. United States, supra.* Under this view, the United States would enjoy no preferential exemption from the 30-day period prescribed in K.S.A. § 12–520.

In addition to the substantial question whether the United States is even entitled to be heard on its annexation argument, there is a serious question as to whether the United States would have any chance of prevailing on the merits of its claim. The plaintiff has cited no authority for its assertion that the statutory requirement that a city prepare and present a "plan for the extension of municipal services" translates into a commandment of substantive law that absent provision for such services a city has no authority to annex without the consent of the affected landowners. Certainly no such rule of law is self-apparent from a literal reading of K.S.A. §§ 12–520, 12–520a and 12–520b, and the court has doubts whether this position could be lawfully sustained—especially in view of the finding of the Kansas Supreme Court that the purpose of the statutory "plan" requirement is merely "to inform the affected landowners of the municipality's decision, what benefits they will receive and what costs they will incur" so that, through the notice and public hearing procedure afforded by statute, they may "attempt to persuade the City that annexation would not be in the best interest of either party." *Clarke v. City of Wichita,* 218 Kan. at 347–48, 543 P.2d at 987. Furthermore, in challenging the City of Leavenworth's annexation of its property, the United States apparently disregards two fundamental precepts of Kansas law: first, that under Kansas Supreme Court decisions the "rule has always been that substantial compliance with an annexation statute is all that can be required," *City of Kansas City v. Board of County Commissioners, supra; Clarke v. City of Wichita, supra;* and second, that in determining whether a city has exceeded its authority in purporting to annex given territory, the court has no occasion to consider the reasonableness, wisdom, necessity, or advisability of the annexation. *State, ex rel. Kreamer v. City of Overland Park,* 192 Kan. 654, 391 P.2d 128 (1964); *Sabatini v. Jayhawk Construction Company,* 214 Kan. 408, 520 P.2d 1230 (1974). At this point in time, under these standards of law, the United States has not established to the court's satisfaction the likelihood of success on the merits of its plea. The City's plan is not alleged to be a "hoax" or anything other than a *bona fide* and honest statement of its intentions, and the plaintiff's challenge to the annexation ordinance in question therefore depends upon a construction of Kansas law that is—so far as the court can ascertain—unsubstantiated by persuasive authority.

It appears to the court that the plaintiff not only has failed to establish its probable success on the merits of its claim, but also has failed to demonstrate that it will suffer irreparable injury if the temporary injunction prayed for is not granted. All parties to this litigation have agreed to a temporary restraining order signed by this court on September 7, 1977. Under this order, the defendants are prohibited from assessing or attempting to collect from agencies of the United States any portion of the challenged municipal franchise fee until such time as judgment is entered herein. In view of this stipulated order, the plaintiff's fears that essential services to federal agencies may be terminated has no foundation.

For all of the reasons stated above,

IT IS THEREFORE ORDERED that the plaintiff's motion for a preliminary injunction be and hereby is denied. Counsel for the defendants shall prepare, circulate, and forward for the court's approval and signature a Journal Entry of Judgment reflecting the holdings of the foregoing Memorandum and Order.