# Immunity of Veterans Administration Medical Facilities from Alabama State Utility License Tax

The utility license tax imposed by the State of Alabama on public utilities operating within that State, whose economic burden is passed on by the utilities to their customers by order of the state public utility commission, is constitutionally valid as applied to federal agencies, since its legal incidence falls on the utilities and not on their customers.

In determining whether the legal incidence of a state tax was intended by the legislature to fall upon the federal government, and is thus prohibited under the Supremacy Clause, a tax scheme as a whole and the context in which it operates, as well as the terms of the taxing statute, must be considered.

The fact that the terms of the taxing statute do not require the tax to be passed on to customers, and do not provide a mechanism for doing so, is indicative of the legislature's intent that the incidence of the license tax remain on the utilities.

May 26, 1982

## MEMORANDUM OPINION FOR THE GENERAL COUNSEL, VETERANS ADMINISTRATION

This responds to your request for the opinion of this Office regarding the immunity of certain Veterans Administration facilities operating in the State of Alabama from the Alabama utility license tax imposed on public utilities by § 40–21–53 of the Code of Alabama, 1975, *as amended* (hereafter § 53). By operation of a 1969 order of the Alabama Public Service Commission, a percentage of this tax is reflected automatically in customer billings, including those sent by the Alabama Power Company to the Veterans Administration Medical Centers which are the subject of your inquiry.

As you are aware, the Supremacy Clause of the United States Constitution, Article VI, clause 2, has been construed to prohibit the states from taxing directly the properties, functions, agencies, or instrumentalities of the federal government (hereafter federal agencies) in the absence of congressional consent, *Mayo v. United States,* 319 U.S. 441 (1943); *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316 (1819), as well as from imposing taxes the "legal incidence" of which falls on the federal government. *United States v. New Mexico,* 455 U.S. 720 (1982); *Alabama v. King & Boozer,* 314 U.S. 1 (1941); *James v. Dravo Contracting Co.,* 302 U.S. 134 (1937). *See United States v. County of Fresno,* 429 U.S. 452 (1977); *United States v. Mississippi Tax Comm'n,* 421 U.S. 599 (1975). Evaluating the constitutionality of any particular state tax in light of these

273

prohibitions necessarily requires consideration of the many factors bearing on the critical question of whether the incidence of the disputed tax falls upon an agency of the United States or whether it falls upon a third party doing business with the United States. *See United States* v. *New Mexico, supra; United States* v. *City of Leavenworth,* 443 F. Supp. 274, 281 (D. Kan. 1977). *See also United States* v. *Allegheny County,* 322 U.S. 174, 186 (1944) ("The distinction between taxation of private interests and taxation of governmental interests, although sometimes difficult to define, is fundamental in application of the immunity doctrine. . . .").

For the reasons set forth in detail below, we believe that the utility license tax imposed by § 53 of the Public Utilities chapter of the Alabama Revenue Code is a tax on the utility companies, the economic burden of which may be—but is not required by statute to be—passed on to their customers; the tax is therefore constitutionally permissible as applied to customers which are federal agencies.

## I. Background

Section 53 imposes a license tax on public utilities operating within the state in an amount equal to 2.2 percent of each dollar of the utilities' gross receipts from the preceding year, with certain exceptions.[1] Section 53 requires payments of the tax to include a statement by the owner, president, or other officer of the utility company reflecting the names of the utility's owners and operators, as well as its principal place of business, together with a sworn statement of the amount of the utility's gross receipts for the preceding year.

---

[1] Section 40–21–53 of the Code of Alabama, 1975, as amended in 1981, provides in pertinent part.

> § 40-21-53. Electric, hydroelectric, gas, or any other public utility—Generally—Credit on electric bills for certain persons—Amount.

> (a) *Each person, firm or corporation . . operating an electric or hydroelectric public utility . shall pay to the state a license tax equal to two and two-tenths percent on each $1.00 of gross receipts of such public utility for the preceding year,* except, that gross receipts from the sale of electricity for resale by such electric or hydroelectric public utilities and gross receipts from the sale of electricity to the persons identified in subsection (b) of this section shall be deducted in computing the amount of tax due hereunder. . . Such license tax shall be paid to the department of revenue by check made payable to the treasurer and shall be paid quarterly. . . . Payment shall be accompanied by a statement made by the president or other officer of the public utility or by the owner thereof, giving the name of the person, firm or corporation owning and operating such public utility and the principal place of business thereof, together with a statement under oath of the amount of gross receipts of such public utility for the preceding year The books of every person, firm or corporation operating such utility shall be at all times open to the inspection of the department of revenue Any person failing to make such sworn statement or willfully making a false statement of the gross receipts of such public utility shall be guilty of a misdemeanor and, upon conviction thereof, shall be fined not exceeding $500.00 and shall also forfeit to the state three times the amount of the license for such public utility. .

> (b)(1) On or after October 1, 1981 any person who is 62 years of age or older or totally and permanently disabled and such person is head of a household and does not share his or her residence with more than one other adult person who is less than 62 years of age and who receives electricity at such residence from a utility which is subject to the 2.2 percent license tax levied in subsection (a) of this section shall be entitled to qualify, in accordance with the provisions of [the Department of Pensions and Security] for a credit on his or her monthly electric bill in the amount of the exemption from the 2.2 percent license tax with respect to sales of electricity to such person provided in subsection (a) of this section *Eligibility for this credit applies only to the extent and amount that* it is billed to the customers as a normal requirement under its rates.

(Emphasis added )

274

Your present inquiry arises in the context of a dispute between the Alabama Power Company and the Alabama District Office of the Veterans Administration regarding the immunity of the several Veterans Administration Medical Centers (VAMCs) located throughout the State from the § 53 state utility license tax. This tax is imposed on the Alabama Power Company in the amount of 2.2 percent of the utility's gross receipts from the preceding year, 1.8 percent of which is included as a separate line item in the VAMCs' utility bills. The District Counsel for the Veterans Administration takes the position that the medical centers are immune from paying that portion of their utility bills which reflects the license tax assessed against the utility company, arguing that the tax, as applied to the VAMCs, constitutes an infringement of Article VI, clause 2 because it is a direct tax on a federal agency. The Alabama Power Company takes the contrary position, arguing that the license tax imposed by § 53 is applicable *only* to the utility companies, is not required by statute to be passed on to the companies' customers and, as such, may be included in the billings sent to customers, including federal agencies, without infringing the United States' constitutional immunity.

To support its position that the § 53 license tax is an impermissible tax on a federal agency, the District Counsel for the Veterans Administration relies heavily on an April 28, 1969, order of the Alabama Public Service Commission. That order provides as follows:

> Bills shall be increased to offset the applicable proportionate part of any taxes, assessments, licenses, franchise fees or rentals which may hereafter be imposed upon the Company by any Government Authority at rates higher than those in effect December 31, 1967 and which are assessed on the basis of meters, customers, the price of or revenues from electric energy sold or the volume of energy generated, purchased for resale or sold.

The Alabama Power Company construes this order as merely providing a "convenient mechanism for the Company to recover its direct cost of operation,"[2] rather than as transferring the legal incidence of the license tax from the utility company to its customers.

Prior to the Commission's promulgation of the 1969 order, the license tax on public utilities was 0.4 percent. *See* Code of Alabama, 1940, T.51, § 178. The enactment of § 53 in 1971 raised the tax to the present 2.2 percent. Thus, the 1.8 percent increment increase in the license tax is reflected separately on the customers' bills as a result of the Public Service Commission's order. For more than two years, the VAMCs have withheld this amount from their electricity bill payments upon the advice of the District Counsel for the Veterans Administration that any increase in taxes after the 1969 order would constitute a direct tax on the agencies. Since the time of your inquiry to this Office, the Comptroller General

[2] Letter from Counsel to the Alabama Power Company to District Counsel to the Veterans Administration (Aug 3, 1981) at p. 2.

275

was requested by the Deputy Administrator of the General Services Administration to consider this matter, and, on February 22, 1982, rendered a decision concluding that the legal incidence of the license tax is on the utility company, and that the VAMCs should reimburse the Alabama Power Company for payments attributed to the tax increase which heretofore have been withheld. *See* Dec. Comp. Gen. B–204517, "Veterans Administration Medical Centers— Payment of Alabama Public Utility License Tax" (February 22, 1982). We turn now to our consideration of this matter.

## II. State Taxation of Federal Entities

The federal government's immunity from taxation by the States derives from the Supreme Court's declaration in *McCulloch* v. *Maryland,* 17 U.S. (4 Wheat.) 316 (1819), that such immunity is inherent in the Supremacy Clause of the Constitution:

> [T]he states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that supremacy which the constitution has declared.

*McCulloch, supra,* at 436. *See Weston* v. *City Council,* 27 U.S. (2 Pet.) 449 (1829). Since the decision in *McCulloch, supra,* the Supreme Court has "adhered to the rule that States may not impose taxes directly on the Federal Government, nor may they impose taxes the legal incidence of which falls on the Federal Government." *United States* v. *County of Fresno,* 429 U.S. 452, 459 (1977) (footnote omitted). Notwithstanding the clarity of this formulation, the determination of where the legal incidence of any particular tax falls necessarily requires close analysis of the taxing statute "in the light of all relevant circumstances," and is rarely made without some difficulty.[3]

In *James* v. *Dravo Contracting Co.,* 302 U.S. 134 (1937), the Court distinguished between the legal incidence and the economic incidence of a state tax affecting the federal government. The Court held that a nondiscriminatory West Virginia occupation tax on the gross receipts of a private contractor doing business with the federal government was constitutionally valid, even though the tax might have increased the cost of the contract to the federal government. Such a tax, the Court stated, would "unquestionably increase[] the expense of the contractor in performing his service and may, if it enters into the contractor's estimate, increase the cost to the [federal] Government." 302 U.S. at 160.

---

[3] *See, e.g , United States* v. *Maryland,* 471 F. Supp 1030, 1037 (D Md 1979) (emphasis added)

In determining where the legal incidence of a tax falls, a court must consider the taxing statute in the light of all relevant circumstances. *United States* v *City of Detroit,* 355 U S 466, 469 (1957). *The inquiry is a legalistic one, and the result often turns on the interpretation to be given a statute* Small differences in the language of the statutes or in the facts of two different cases can therefore result in decisions which might appear inconsistent in the absence of close analysis.

Nevertheless, to the extent that the state tax imposed on the contractor "affects the federal government at all, it at most gives rise to a burden which is consequential and remote and not to one that is necessary, immediate or direct." *Id.*, citing *Trinity-farm Construction Co.* v. *Grosjean,* 291 U.S. 466 (1934). The principles articulated in *Dravo* were reaffirmed in *Graves* v. *New York ex rel. O'Keefe,* 306 U.S. 466 (1939), in which the Court sustained a nondiscriminatory state tax on the income of a federal employee:

> [A] non-discriminatory tax laid on the income of all members of the community could not be assumed to obstruct the function which [a government entity] had undertaken to perform, or to cast an economic burden upon [it], more than does the general taxation of property and income which, to some extent, incapable of measurement by economists, may tend to raise the price level of labor and materials.

306 U.S. at 484 (footnote omitted).

The *Dravo* principle was further refined in *Alabama* v. *King & Boozer,* 314 U.S. 1 (1941), and its companion case, *Curry* v. *United States,* 314 U.S. 14 (1941), in which the Court upheld state taxes[4] imposed upon contractors performing "cost-plus-fixed-fee" contracts with the federal government. Even though the taxes levied against the contractors were included in the "costs" assessed against the federal government, the Court held that the economic impact of the tax was not, standing alone, a sufficient basis for invalidation as an unconstitutional taxing by the State of the federal government or its agents.[5] The United States was not a purchaser within the contemplation of the Alabama sales or use tax statutes and, therefore, was not legally obligated to pay the tax. *See also Gurley* v. *Rhoden,* 421 U.S. 200, 204 (1975) (holding that the economic burden of taxes on the vendor is traditionally shifted to vendee in the form of increased prices for service in the amounts of the taxes, but that such a shift is not indicative of a shift in legal incidence, particularly if the statute does not require the vendor to pass the tax on to the purchaser-consumer).[6]

---

[4] The disputed tax in *King & Boozer, supra,* was a sales tax on lumber sold by King & Boozer (K&B) for use by contractors constructing an army camp for the United States. Although the tax was chargeable to K&B as the seller, K&B was required by the language of the statute to collect the tax from the purchaser—in this case, the government contractor. In *Curry, supra,* the dispute involved a use tax imposed upon materials brought into the state for use by a contractor.

[5] *Compare Kern-Limerick* v. *Scurlock,* 347 U.S. 110 (1954), holding that an Arkansas gross receipts tax on a contractor performing a "cost-plus-fixed-fee" contract with the federal government was an unconstitutional infringement of the federal government's immunity where the contract expressly provided that (1) its contractors were purchasing agents for the government, (2) the purchase was made by the government, (3) the government was obligated to the vendor for the purchase price; (4) the contractor would handle all payments on behalf of the government, and (5) title to all materials and supplies purchased vested in the government directly from the vendor. The Court noted that "it [was] clear that the Government [was] the disclosed purchaser and that no liability of the purchasing agent to the seller [arose] from the transaction." 347 U.S. at 120–21 *But cf. United States* v. *New Mexico,* 455 U.S. 720, 724–25 (1982) (discussing the limitations of the *Kern-Limerick, supra,* analysis).

[6] Indeed, in later years the Court found insignificant the fact that property which provided the basis for an assessment of a state use tax was property *owned* by the federal government, so long as the uses or improvements which were subject to the tax were "being used by a private citizen or corporation and so long as it is the possession or use by the private citizen that is being taxed." *United States* v. *County of Fresno,* 429 U.S. 452, 462 (1977) Such use or improvement by a private citizen for his own private ends, or in connection with commercial activities carried

277

The Court's most recent consideration of the issues raised by state taxation of federal government contractors involved a use tax and a gross receipts tax levied on three contractors with "cost-plus-fixed-fee" contracts with the Department of Energy. *United States* v. *New Mexico,* 455 U.S. 720 (1982). The contracts provided that: (1) title to all tangible personal property purchased by the contractors would pass directly from the vendor to the Government; (2) the contractors would place orders with third party suppliers in their own names, identifying themselves as the buyers; and (3) the contractors would use an "advanced funding" procedure to meet contracting costs.[7] The United States unsuccessfully challenged the contractors' liability for the New Mexico taxes, alleging, essentially, that the contractors were "procurement agents" for the federal government and were, therefore, immune from taxation by the State.[8] After reviewing its precedents and outlining the limits on the immunity doctrine,[9] the Court concluded:

> What the Court's cases leave room for, then, is the conclusion that tax immunity is appropriate in only one circumstance: when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being taxed is concerned. . . .
>
> Thus, a finding of constitutional tax immunity requires something more than the invocation of traditional agency notions: to resist the State's taxing power, a private taxpayer must actually "stand in the Government's shoes." *City of Detroit* v. *Murray Corp.,* 355 U.S. at 503 (opinion of Frankfurter, J.).

455 U.S. at 735–736. The Court relied heavily on its earlier decision in *United States* v. *Boyd, supra,* in which it rejected "out-of-hand" the Government's claim

on for profit, constitutes a "separate and distinct taxable activity." *United States* v *Boyd,* 378 U S. 39, 44 (1964). *See also City of Detroit* v *Murray Corp ,* 355 U.S. 489 (1958), *United States* v. *Township of Muskegon,* 355 U S 484 (1958); *United States* v. *City of Detroit,* 355 U.S 466 (1958) The rule to be derived from these decisions is that the "economic burden on a federal function of a state tax imposed on those who deal with the Federal Government does not render the tax unconstitutional so long as the tax is imposed equally on the other similarly situated constituents of the State " *County of Fresno, supra,* 429 U S at 462 (footnote omitted).

[7] The "advanced-funding" mechanism allowed the contractors to pay their creditors and employees with drafts drawn on a special bank account in which United States Treasury funds were deposited. Thus, only federal funds were expended when the contractors made purchases. Moreover, if the government failed to provide funding, the contractors were excused from performance of the contract and the government was held liable for all properly incurred claims. 455 U.S. at 725–26.

[8] The United States sought a declaratory judgment that advanced funds were not taxable gross receipts to the contractors; that the receipts of vendors selling property to the Government through the contractors were not taxable by the States; and that the use of government-owned property by the contractors was not subject to the use tax *See* 455 U S. at 732–33.

[9] *See* 455 U.S at 734–35, where the Court discussed at length its decisions in *Alabama* v. *King & Boozer, supra* ("immunity may not be conferred simply because the tax has an effect on the United States, or even because the Federal Government shoulders the entire economic burden of the levy"); *James* v *Dravo Contracting Co., supra* ("immunity cannot be conferred simply because the state tax falls on the earnings of a contractor providing services to the Government"); and *United States* v *Boyd, supra* ("(i)n a situation [where] the [private] contractor's use of [Government-owned] property [to provide the United States with] goods or services [is] in connection with commercial activities carried on for profit [, such use constitutes] a separate and distinct taxable activity. . Indeed, immunity cannot be conferred simply because the tax is paid with Government funds . [even] where the contractor made expenditures under an advanced funding arrangement similar to the one involved here")

278

that its advanced-funded contractors were " 'so assimilated by the Government as to become one of its constituent parts.' " *Id.*, quoting *Boyd, supra*, 378 U.S. at 47, quoting *United States* v. *Township of Muskegon*, 355 U.S. 484, 486 (1958).[10]

Thus, the Court in *United States* v. *New Mexico, supra*, rejected a claim of constitutional immunity on facts which were even more compelling than those in *Boyd, King & Boozer*, and *Dravo*. The Court reasoned that the extreme difficulties which are involved in determining the allocation of power between co-existing sovereignties *requires* such a narrow construction of the constitutional immunity, and concluded that

> [i]f the immunity of federal contractors is to be expanded beyond its narrow constitutional limits, it is Congress that must take responsibility for the decision, by so expressly providing as respects contracts in a particular form, or contracts under particular programs. . . . But absent congressional action, we have emphasized that the States' power to tax can be denied only under the clearest constitutional mandate.

455 U.S. at 737–38 (citations omitted).

The Court in *United States* v. *Mexico, supra*, set forth in the clearest possible terms the narrowness of the limitations that it would construe the Supremacy Clause to impose on the ability of states to tax federal contractors—even when the tax is paid with federal funds; however, the Court left undisturbed its prior decisions finding the immunity appropriate "when the [state] levy falls [directly] on the United States itself." 455 U.S. at 735. Thus, in contrast to taxes which merely pose an *economic* burden to the federal government, *see, e.g., United States* v. *New Mexico, supra*, taxes which fall directly on federal agencies continue to support claims of immunity by those agencies. As the following cases demonstrate, taxes which are *required* by the terms of the statute to be passed on to the purchaser or customer become legal obligations of the customer, and, to the extent that such "legal incidence" bears on the federal government, are unconstitutional as applied.

In *First Agricultural National Bank* v. *Massachusetts State Tax Comm'n*, 392 U.S. 339 (1968), the Court invalidated a Massachusetts sales tax levied upon vendors of tangible personal property; this tax was required to be "add[ed] to the sales price and . . . collect[ed] from the purchaser . . . [as] a debt from the purchaser to the vendor, . . . recoverable at law in the same manner as other debts," *id.* at 347, when applied to national banks.[11] Similarly, a regulation of the

---

[10] In further defining the limits of "agencies" of the federal government for purposes of the immunity doctrine, the Court recalled language in earlier opinions requiring that would-be federal entities be "virtually . . . arm[s] of the Government," *Department of Employment* v. *United States*, 385 U S 355, 359–60 (1966); "integral parts of [a governmental department]," and "arms of the Government deemed by it essential for the performance of governmental functions," *Standard Oil Co* v *Johnson*, 316 U S 481, 485 (1942) *United States* v. *New Mexico, supra* at 733–38

[11] The Court stated.

> It would appear to be indisputable that a sales tax which *by its terms* must be passed on to the purchaser imposes the legal incidence of the tax upon the purchaser . . . There can be no doubt from the clear wording of the statute that the Massachusetts Legislature intended that this sales tax be passed on to the purchaser. For our purposes, at least, that intent is controlling.

392 U.S. at 347–48 (citations omitted) (emphasis added)

279

Mississippi State Commission requiring out-of-state distillers and suppliers to collect from military installations within the State a sales tax on liquor sold to the installations was held invalid as a tax upon instrumentalities of the United States. *United States* v. *Mississippi State Tax Comm'n,* 421 U.S. 599 (1975). The Court viewed the language of the regulation requiring that all direct orders of alcoholic beverages from out-of-state distillers by military facilities bear a wholesale mark-up price, that the price be paid directly to the distiller, and that the distiller remit the wholesale markup to the Tax Commission, as particularly indicative of the Commission's clear intention that the out-of-state distillers and suppliers pass on the markup to the military purchasers. In addition, the Court pointed to a letter from the Director of the Alcoholic Beverage Control Division of the Commission informing distillers

> that the wholesale markup "must be invoiced to the Military and collected directly from the Military (Club) or other authorized organization located on the Military base," warning that any distiller who sells alcoholic beverages to the military without "collecting said fee directly from said Military organization shall be in violation of the Alcoholic Beverage Control laws and regulations issued pursuant thereto," and subject to the penalties provided, including delisting.

421 U.S. at 609. However, even in the absence of so clear a statement of the Tax Commission's intent, the Court noted that it was "obvious" that "economic realities compelled the distillers to pass on the economic burden of the markup." 421 U.S. at 609–10 n.8. Referring to its decision in *First Agricultural National Bank, supra,* the Court concluded that *"where a State requires that its sales tax be passed on to the purchaser and be collected by the vendor from him, this establishes as a matter of law that the legal incidence of the tax falls upon the purchaser."* 421 U.S. at 608 (emphasis added).

The Ninth Circuit recently expanded upon the Court's suggestion in *Mississippi State Tax Comm'n, supra,* that the legal incidence of a particular tax is determined upon consideration of the taxation scheme as a whole—including the economic realities compelled by the circumstances as well as the literal terms of the statute. In *United States* v. *California State Board of Equalization,* 650 F.2d 1127 (9th Cir. 1981), *aff'd mem.,* 456 U.S. 901 (1982), the court of appeals held a California sales tax unconstitutional when applied to leases of tangible personal property to the United States, because the legal incidence of the tax fell on the United States, even though the taxing statute provided that the parties to the sales agreement could reach an agreement among themselves as to who would pay the sales tax.[12] Two other components of the taxing statute which were essential to the

---

[12] Section 1656.1 of the California Civil Code provides in pertinent part

> § 1656.1 Sales tax reimbursement to retailer; addition to sales price; rebuttable presumptions; schedule
> (a) Whether a retailer may add sales tax reimbursement to the sales price of the tangible personal property sold at retail to a purchaser depends solely upon the terms of the agreement of sale It shall

court's conclusion were § 6051 of the California Revenue and Taxation Code, which imposes a sales tax on the seller's gross receipts,[13] and § 6012, which provides that the amount of the tax is deducted from the seller's gross receipts if the seller establishes that he collected the sales tax from the buyer.[14] Thus, although the language of the taxing statute was facially neutral, the court determined that the seller maximizes his profit only if he separately states and collects the tax from the buyer—thereby creating a strong economic incentive to impose the tax on the buyer.[15]

In reaching this conclusion, the court was guided by the analytical principle, reaffirmed in *Mississippi State Tax Comm'n, supra,* and *First Agricultural National Bank, supra,* that the legal incidence of a tax falls on the party whom the legislature intends will pay the tax. The court reasoned:

> A determination of legal incidence is not, however, an inquiry into who is legally obligated to remit the collected tax to the state. That is, the legal incidence of a tax does not necessarily fall on the party who acts as conduit by forwarding collected taxes to the state. . . . The concept of legal incidence must also be

---

be presumed that the parties agreed to the addition of sales tax reimbursement to the sales price of tangible personal property sold at retail to a purchaser if.

    (1) The agreement of sale expressly provides for such addition of sales tax reimbursement;

    (2) Sales tax reimbursement is shown on the sales check or other proof of sale; or

    (3) The retailer posts in his premises in a location visible to purchasers, or includes on a price tag or in an advertisement or other printed material directed to purchasers, a notice to the effect that reimbursement for sales tax will be added to the sales price of all items or certain items, whichever is applicable.

    (b) It shall be presumed that the property, the gross receipts from the sale of which is subject to the sales tax, is sold at a price which includes tax reimbursement if the retailer posts in his premises, or includes on a price tag or in an advertisement (whichever is applicable) one of the following notices.

    (1) "All prices of taxable items include sales tax reimbursement computed to the nearest mill."

    (2) "The price of this item includes sales tax reimbursement computed to the nearest mill "

*    *    *    *    *

    (d) The presumptions created by this section are rebuttable presumptions.

[13] Section 6051 provides in pertinent part:

> For the privilege of selling tangible personal property at retail a tax is hereby imposed upon all retailers at . . [a specified rate] of the gross receipts of any retailer from the sale of all tangible personal property sold at retail in this state. . .

[14] Section 6012 provides in pertinent part:

> (c)(8) For purposes of the sales tax, if the retailers establish to the satisfaction of the board that the sales tax has been added to the total amount of the sale price and has not been absorbed by them, the total amount of the sale price shall be deemed to be the amount received exclusive of the tax imposed Section 1656 1 of the Civil Code shall apply in determining whether or not the retailers have absorbed the sales tax

[15] The court explained the workings of the California sales tax scheme as follows.

> The seeming neutrality of section 1656 1 is rendered illusory . . by the interaction of California Revenue and Taxation Code sections 6012 and 6051 As noted above, the sales tax is levied on the seller's gross receipts, Cal Rev and Tax. Code § 6051 (West Supp. 1980), which are measured by the total [sale] price. If the [seller] requires the [buyer] to pay the tax, the amount of the tax is deducted from the [seller's] gross receipts. If the [seller] pays the tax himself—absorbs the tax—and passes the economic burden of the tax on to the [buyer] as an increase in the [sale] price, the amount of the tax paid by the [seller] is not deducted from his gross receipts. Since the sales tax is levied on the basis of the [seller's] gross receipts, the [seller] must remit a larger sum of money to the state as taxes if he absorbs the tax himself than if he collects the tax from the [buyer].

650 F.2d at 1131 (citation omitted).

281

distinguished from the notion of economic burden. The constitu-
tion only prohibits the state from levying a tax on the United
States; it does not prohibit the state from enacting a taxing scheme
whose effect is to increase prices paid by the United States.

*      *      *      *      *

In determining who the legislature intends will pay the tax, the
entire state taxation scheme and the context in which it operates as
well as the express words of the taxing statute must be considered.

*      *      *      *      *

Despite the facial neutrality of Section 1656.1, the strong
economic incentive created by Section 6012 all but compels the
lessor to collect the tax from the lessee. In sum, the California
sales tax scheme manifests a legislative intent that the lessee pay
the sales tax. It places the legal incidence of the tax on the United
States and, therefore, violates the United States' constitutional
immunity from state taxation.

650 F.2d at 1131–32 (citations omitted).

In addition to presenting a cogent model for "legal incidence" analysis, the
*California State Board of Equalization* decision is significant for its treatment of
the legislature's statement of its intent. Section 1651.1 was enacted with the
precise, stated purpose of remedying the constitutional infringements posed by
previous sales tax schemes.[16] The Legislative Notes to the new act clearly state
that § 1651.1

provides for changes in the California Sales and Use Tax Law to
make it clear that for both federal and state tax purposes the
incidence of the California sales tax is upon the retailer for the
privilege of selling tangible personal property at retail and is not
upon the purchaser.

*      *      *      *      *

Although the California sales tax law has uniformly been
construed by the California Legislature, courts, and admin-
istrative agencies as imposing an excise tax upon the retailer and
as imposing no legal obligation upon a purchaser, the law does not
prevent the parties from contracting between themselves for

---

[16] Section 19 of Cal Stat. 1978, c. 1211, pp 3925–26 provides some background to the new legislation.

The Legislature in adopting the Sales Tax Act in 1933 intended that the incidence of the sales tax be
on the retailer. In Section 8 of Chapter 681 of the Statutes of 1941, the following statement appears:
" . . the Legislature hereby declares and reaffirms that the sales tax is not imposed on any purchaser
of tangible personal property in this state, but is for the privilege of engaging in the business of
selling such property." Notwithstanding such legislative intent and decisions of California courts
holding that the incidence of the California sales tax is upon the retailer and not upon the purchaser,
the United States Supreme Court in *Diamond National Corp.* v. *State Board of Equalization* [425
U.S 268 (1976)], and the Court of Appeals for the Ninth Circuit in *United States of America* v *State
Board of Equalization*, 536 F 2d 294 [(1976) (per curiam)], held that for federal purposes the
incidence of the California sales tax is on the purchaser.

282

> collection by the retailer of reimbursement for the sales tax from his customer in order to obtain the benefit of a lower sales tax measure or income tax deduction of the sales tax reimbursement by the purchaser or for any other purpose. . . . Ascertainment of this intention is necessary to a determination of a proper measure of sales tax and for other purposes. Accordingly, the purpose of the Legislature in adding Section 1656.1 to the Civil Code is to create a rebuttable presumption as to the intention of the parties for use in the absence of evidence of other intention by those who have occasion to use this information.

1978 Cal. Stat., §§ 19, 22, c. 1211, pp. 3925, 3926. *See also* 650 F.2d at 1128. Notwithstanding these statements of legislative intent, the Ninth Circuit found that the sales tax was intended by the legislature to be a tax on the buyer. Thus, this decision makes clear that the federal courts are not bound by state legislative and judicial determinations of the legal incidence of a particular state tax with respect to the United States or its agencies. *See Diamond National Corp.* v. *State Board of Equalization*, 425 U.S. 268 (1976). "For the purpose of determining whether a tax affects a federally immune institution, the test for incidence must be a federal one." *United States* v. *State Board of Equalization*, 450 F. Supp. 1030, 1035 (N.D. Cal. 1978), citing *First Agricultural National Bank* v. *Massachusetts State Tax Comm'n*, *supra*, 392 U.S. at 347.

Against this general background, two recent district court decisions bear directly on your inquiry whether the legal incidence of the Alabama utility license tax falls, as a matter of law, on the vendor or the vendee of Alabama Power Company's utility services. The first case, *United States* v. *City of Leavenworth*, 443 F. Supp. 274 (D. Kan. 1977), *app. dismissed by stipulation of parties*, No. 79–1088 (10th Cir.), involved a 3 percent franchise fee imposed by the City in 1963 upon all utility companies, including Kansas Power & Light, which provide electricity to the Fort Leavenworth military installation and the United States Penitentiary, operated respectively by the United States Department of the Army and the Federal Bureau of Prisons. Prior to the City's imposition of the fee, the Kansas State Corporation Commission had authorized public utilities to pass on as "hidden costs" to all customers within the boundaries of their respective service areas the financial burden occasioned by the franchise fees of particular cities. When the City imposed the franchise fee on the utilities' gross revenues from the sale of electricity, the Commission sought to remedy the discriminatory effects of the existing regulatory policy by which all utility customers in the State were required to contribute equally to the fee, without regard to whether their city had chosen to impose a franchise fee. To this end, the Commission ordered in 1966 that all future franchise fees be directly charged on a *pro rata* basis to only such utility customers as lived within the municipal boundaries of the city exacting the fee, and that each customer's bill reflect as a separate item his *pro rata* share of any pertinent franchise fee. The controversy in *Leavenworth*, *supra*, arose when the City annexed the property on which Fort Leavenworth and

the federal penitentiary are located, thereby occasioning a 3 percent franchise fee addition to their Kansas Power & Light electricity bills. The Bureau of Prisons and the Department of the Army refused to pay the 3 percent fee on the ground that it was an impermissible tax upon the federal government.

The issue before the court in *Leavenworth, supra,* was whether the incidence of the City's franchise fee fell upon agencies of the United States, or whether it fell upon a third party doing business with the United States, Kansas Power & Light. In concluding that the fee did not fall directly upon the federal agencies, but rather upon the utility company, the court stated:

> [T]he Supreme Court has "squarely rejected" the proposition that the legal incidence of a tax falls always upon the person legally liable for its payment. *First Agricultural National Bank* v. *Tax Commission,* 392 U.S. 339 (1968); *United States* v. *Mississippi Tax Commission,* 421 U.S. 599 (1974). Further, the decision as to where the legal incidence of a tax falls is not determined by who bears the ultimate economic burden thereof. *E.g., Gurley* v. *Rhoden,* 421 U.S. 200 (1975). These factors however, together with considerations as to (1) the legislative history of the tax and the intent of the taxing authority; (2) the rights and obligations of the parties to the transaction on which the tax is imposed; and (3) whether the economic burden of the tax, if imposed on a non-governmental agency, is required to be passed on to the United States, must be weighed into the court's determination.

443 F. Supp. at 281–82. Applying these factors, the *Leavenworth* court found that the City franchise fee was laid upon the privilege extended to utilities to use public property in the City for business purposes and to sell electricity to municipal residents, and that, as such, legal liability for payment of the exaction fell upon Kansas Power & Light. The court observed that the ordinance imposing the fee "contain[ed] no provisions for collection directly from the United States, nor [did] it purport to authorize any procedures whereby penalties for nonpayment—such as liens or encumbrances upon government property—[could] be sought against the United States property or its treasury." *Id.* at 282. The court found insignificant the fact that the economic burden of the fee was passed on to the federal agencies by the terms of their sales contracts with the utility, "[n]or does the fact that the United States may be required under Kansas State Corporation Commission orders to reimburse Kansas Power & Light for a *pro rata* share of the franchise fee alter the incidence of the tax as originally laid." *Id.* at 282–83.

The *Leavenworth* decision is particularly helpful to our consideration of the Alabama license tax, because the franchise fee imposed by the Leavenworth city ordinance was not, by the terms of the ordinance—as the Alabama tax is not by the terms of its authorizing statute—*required* to be passed on to the customers of the taxed utilities. Nevertheless, in both cases the state public utility

commissions required the customers of the taxed utilities to raise their bill payments by a proportionate share of the utilities' increased tax liability.[17]

In 1979, another district court considered a similar challenge to a Maryland statutory environmental surcharge as applied to purchases of electricity by federal agencies. The challenged statutes in *United States* v. *State of Maryland*, 471 F. Supp. 1030 (D. Md. 1979), involved a surcharge on electric energy generated within the State which was first imposed on electric companies in 1971. Revenues from the surcharge were required by the terms of the statute to be collected from the electric companies by the Comptroller of the State and placed in a special fund known as the Environmental Trust Fund. For the years 1971 through 1974, the statute required the Public Service Commission to "authorize the electric companies to add the full amount of the surcharge to customers' bills." *Id.* at 1034. In 1974, the Maryland Legislature amended the statute to provide that the Public Service Commission

> shall authorize the electric companies to add the full amount of the surcharge to customers' bills. *To the extent that the surcharge is not collected from customers, the surcharge shall be deemed a cost of generation* and shall be allowed and computed as such, together with other allowable expenses, for rate-making purposes. Revenues from the surcharge shall be collected by the Comptroller and placed into the special fund known as the Environmental Trust Fund.

*Id.* (emphasis added).

The United States challenged the State's exaction of this surcharge from federal agencies pursuant to both the original and the amended legislation as an unconstitutional tax by the State on agencies of the United States. The *Maryland* court, citing *Leavenworth, supra,* approvingly, observed that the circumstances in the *Maryland* case were even more supportive of the constitutionality of the

---

[17] The United States filed an appeal of this decision to the Tenth Circuit, but the appeal was later dismissed by stipulation of the parties (10th Cir No 79–1088). *See* Memorandum from Assistant Attorney General Ferguson, Tax Division, "Memorandum for the Solicitor General Re. *United States* v. *City of Leavenworth, Kansas*" at 3 (Mar. 16, 1979), recommending that the appeal be dismissed, on the ground that "the 'exaction' complained of is not a tax but a user fee, rental, or charge imposed on the electric company for the right to use the city's streets," to which the Supreme Court has held the intergovernmental constitutional immunities inapplicable *See Massachusetts* v *United States*, 435 U.S. 444 (1978) Nor did the impact of the Kansas State Corporation Commission's order alter the analysis contained in the Ferguson Memorandum

> The fact that the state regulatory commission ordered that all franchise fees were to be charged pro rata to the customers within the city exacting the fee does not change the character of the fee from a user fee or rental, etc , to a tax imposed on the consumer. It merely reflects an additional cost of doing business which is passed on to the subscribers, just as every unsubsidized business must "pass on" and recover from its customers every item of operating expense—including state and federal taxes—if it is to operate profitably This, indeed, was the central point of *Agron* v. *Illinois Bell Telephone Co.*, 449 F 2d 906 (C.A. 7, 1971), *cert. denied*, 405 U S 954 (1972) In *Agron,* [the United States] argued, and the court of appeals recognized (449 F 2d at 909), that in public utility rate regulation the regulatory body charged with establishing a fair rate and return is required to sanction rates that will permit the utility to recover or pass on all appropriate expenses, including taxes *Galveston Electric Co.* v *Galveston,* 258 U.S. 388, 399 (1922); *Georgia Railway & Power Co* v *Railroad Commission,* 262 U S. 625, 632–33 (1923), *FPC* v *United Gas Pipe Line Co* , 386 U.S 237, 243 (1967)

Memorandum, *supra* at 5–6.

taxing statute than were the circumstances in *Leavenworth*. The court concluded that "neither the 1974 Act nor the 1971 Act requires that Maryland's environmental surcharge be passed along to customers of the electric companies [, and] [a]ccordingly, . . . the exactions in question are valid and constitutional." *Id*. at 1038.[18]

The factors considered by the court in reaching this conclusion were several. First, the court noted that the titles of both statutes, as well as their language, made clear that the surcharge was a "direct obligation of the electric companies," which the companies could, at their option, pass on to customers or simply compute as part of their costs of generation and therefore be recovered in the form of higher rates. *Id*. Second, citing the Supreme Court's decision in *Gurley* v. *Rhoden, supra,* the district court found persuasive the fact that the statutes had no provisions making the customers liable for payment of the surcharge if the utility companies themselves did not pay the surcharge.[19] *Id*. at 1040. Finally, the court relied on the principle recognized in *Graves* v. *New York ex rel. O'Keefe,* 306 U.S. 466, 483 (1939), as a guide to construing ambiguous or "awkwardly drafted statutory provisions," namely, that "the implied immunity of one government and its agencies from taxation by the other should as a principle of statutory construction be narrowly restricted." *Id*. at 1039.[20]

---

[18] The United States withdrew its appeal of this decision because the Maryland statutory provisions involved were "so fraught with ambiguity" as to render the case an "[in]appropriate vehicle" to support the United States' position Memorandum from Assistant Attorney General Ferguson, Tax Division, "Supplemental Memorandum for the Solicitor General Re *United States v. Maryland*" (Nov 30, 1979). The Ferguson Memorandum also raised a question whether the district court had "too readily accepted" the United States' argument that the environmental surcharge was a tax, rather than a user charge or fee, in support of its claim of federal immunity *Id. See United States v. Maryland, supra,* 471 F Supp. at 1036. *See also* n. 17, *supra*

[19] In concluding that the legal incidence of the disputed tax fell on the vendor in the taxed transaction, the Supreme Court in *Gurley* v. *Rhoden, supra,* found the literal language of the taxing statute to be determinative

> The wording of the . statute plainly places the incidence of the tax upon the [vendor]. . . . The [legislative] purpose to lay the tax on the [vendor] and only upon the [vendor] could not be more plainly revealed Persuasive also that such was [the Legislature's] purpose is the fact that, if the [vendor] does not pay the tax, the Government cannot collect it from his vendees, the statute has no provision making the vendee liable for its payment.

421 U S at 205–06 (footnote and citation omitted)

In his Memorandum to the Solicitor General regarding an appeal of the *Maryland* decision, *see* n 18, *supra,* the Assistant Attorney General for the Tax Division referred to the Court's analysis in *Gurley, supra,* as the "mechanical approach." In contrast, the United States argued in favor of a "semantically broader approach—that the legal incidence of the tax is on the United States when the statute as a whole, considering both text and context, creates a legal compulsion to pass on the tax " This broader approach appears to have been followed by the Ninth Circuit in *United States* v *California State Board of Equalization, supra*

Although the line of cases representing the "narrow" or "mechanical" approach to governmental immunities and culminating in the Court's recent decision in *United States* v *New Mexico, supra,* may appear to be irreconcilable with the "broader" approach taken by the Court in *Mississippi State Tax Comm'n, supra,* and most recently summarily affirmed in *California State Board of Equalization, supra,* the difference between the approaches grows out of an underlying distinction between the two types of questions raised by analyses of the taxing statutes The cases following the "mechanical" approach involved relatively unambiguous statutes which made clear where the legal incidence of the disputed tax fell—the question before the court was whether the taxpaying entities, usually federal contractors, constituted "federal agents" for purposes of immunity analysis, because the economic burden of the tax levy was ultimately passed on to the United States, either directly, through specific contractual arrangements or advanced funding procedures, or indirectly, through price increases In contrast, the cases following the "broader" approach to governmental immunities involved the initial determination of who the legislature intended to pay the tax, *i.e.*, the legal incidence of the tax, in making such a determination, the courts looked closely at the language of the taxing statute, as well as the surrounding circumstances—including the "economic realities"—of the tax scheme

[20] *See also United States v. New Mexico, supra,* 455 U S at 735–36 ("a narrow approach to governmental tax immunity accords with competing constitutional imperatives, by giving full range to each sovereign's taxing authority"), citing *Graves* v. *New York, supra;* and at 738 ("the States' power to tax can be denied only under 'the clearest constitutional mandate'") quoting *Michelin Tire Corp* v. *Wages,* 423 U S. 276, 293 (1976)

Both the *Leavenworth* and the *Maryland* courts relied heavily on the language of the *taxing statutes* to determine whether the legal incidence of the tax fell upon the utility or its customers. In *Leavenworth,* although the State Corporation Commission had required the tax to be passed on, the underlying statute had not, and the court found as a matter of law that the legal incidence of the tax therefore fell upon the utility. Likewise, although less compelling, the Maryland statutes required the Public Service Commission to authorize the electric companies to pass the tax on to their customers. Nevertheless, in both cases "the statutory provisions in question, construed in the light of all the circumstances, . . . control[led] in determining where the incidence of the tax falls." *Maryland, supra,* 471 F. Supp. at 1040.

### III. The Law as Applied to the Alabama Utility License Tax

In order to determine the constitutionality of the Alabama license tax as applied to federal agencies, the critical question to be resolved is whether the legal incidence of the tax falls upon the VAMCs, or whether it falls upon the Alabama Power Company, a third party doing business with the VAMCs. As set forth in detail above, determination of where the legal incidence of a particular tax falls involves close analysis and consideration of the entire State taxation scheme and the context in which it operates, as well as the express words of the taxing statute. *United States* v. *California State Board of Equalization, supra,* 650 F.2d at 1131. *See United States* v. *Mississippi State Tax Comm'n, supra; United States* v. *State of Maryland, supra.* As an aid to this determination, the *Leavenworth* court, as discussed above, suggested three primary inquiries: (1) the legislative history of the tax and the intent of the taxing authority; (2) the rights and obligations of the parties to the transaction on which the tax is imposed; and (3) whether the economic burden of the tax is required by the terms of the statute, or by economic realities, to be passed on to customers which are federal agencies. *Leavenworth, supra,* 443 F. Supp. at 282.

Pursuing these inquiries, we note first that we have available very little of the legislative history of the utility license tax. The tax, by its literal terms, imposes a fee on "electric or hydroelectric public utilities" in an amount equal to 2.2 percent of their gross receipts from the preceding year. This language is in marked contrast to that of §§ 40–21–82, 86, which impose a 4 percent gross receipts tax on public utilities operating within the State,[21] but which specifically require the utilities to "add that tax to the price or charge for such utility services to every purchaser thereof . . . [and to] *collect said amount from every purchaser*

---

[21] Section 40–21–82, Code of Alabama, 1975, provides.

There is hereby levied, in addition to all other taxes of every kind now imposed by law, and shall be collected as herein provided, a privilege or license tax *against every utility* in the state of Alabama on account of the furnishing of utility services by said utility; and the amount of said tax shall be determined by the application of rates against gross sales or gross receipts, as the case may be, from the furnishing of utility services in the state of Alabama and shall be computed monthly with respect to each person to whom utility services are furnished, in accordance with the    . table [provided in this section].

(Emphasis added.)

287

of such utility services[, making it] unlawful for any person furnishing utility services to fail or refuse to collect from the purchaser the amount required by this section to be collected." § 40-21-86, Code of Alabama, 1975, as amended (emphasis added). In addition, § 86 clearly states that the 4 percent gross receipts tax is *"conclusively presumed to be a direct tax on the purchaser* precollected for the purpose of convenience and facility only." *Id.* (emphasis added). Neither the Power Company nor the District Counsel disputes the United States' immunity from this tax, as the terms of the statute clearly indicate that the 4 percent gross receipts tax is intended to be a direct tax on the consumer, and, as far as we are aware, the Power Company has never attempted to pass this tax on to, or collect it from, its customers which are federal agencies. *See* Letter from Counsel to the Alabama Power Company to the District Counsel of the Veterans Administration (Aug. 3, 1981).

The statutory language of §§ 82 & 86 of the Public Utilities chapter of the Revenue Code suggests a clear and unambiguous legislative intent to tax the utility companies' customers directly, and not to impose a tax on the companies themselves; such language presents a clear indication of the legislature's knowledge of the distinction between direct and indirect taxation of the consumer, and is therefore significant in our analysis of the legislative intent of § 53. Had the legislature intended to collect the fee directly from the utilities' customers, it is reasonable to assume that it would have manifested its intent with language similar to the language in § 86; from its failure to do so, as well as from the plain terms of the statutory language that it *did* use, we may infer that the legislature intended to levy the § 53 license tax on the utility companies. *See generally East Brewton Materials* v. *Department of Revenue,* 233 So. 2d 751 (Ala. 1970).[22]

Although we are not aware of this provision's having been construed by the Alabama courts, we do have statements "by the highest officials charged with the duty of administering the tax laws," *id.* at 754, construing this provision.[23] Officials in the Legal Division and the Franchise Tax Division of the State of Alabama Department of Revenue, as well as the Attorney General of the State of Alabama, have construed the 2.2 percent utility license tax imposed by § 53 as a license tax *on the utilities,* "a cost of doing business [which] can be included in the rate base allowed by the Alabama Public Service Commission, . . . itemized on bills, or . . . absorbed partially or wholly by the utility." Letter from Corporate Tax Specialist, Franchise Tax Division, to Telpage, Inc. (January 3, 1977). *See* Letter from Assistant Attorney General, State of Alabama, to Abernethy Memorial Hospital (March 10, 1975); Memorandum from Counsel to the Legal Division, Department of Revenue (March 3, 1975). Further, in a 1977 letter responding to an inquiry regarding the 2.2 percent license tax, the Franchise Tax Division described the tax as:

---

[22] Although the "credit allowance" of subsection (b) of § 53, *see* n. 1 *supra,* appears to assume that the utility companies would increase their customers' rates by an amount sufficient to recover the amount paid in license taxes, the law is settled that the mere shouldering of the ultimate economic burden of a tax is not determinative of where its legal incidence lies *See, e.g . Gurley* v. *Rhoden, supra; King & Boozer, supra; Dravo Contracting Co , supra.*

[23] *See State* v. *Southern Electric Generating Co.,* 151 So 2d 216, 218 (Ala 1963), ("The interpretation by the Attorney General will be given weight as a factor in judicial construction of a statute where its meaning is doubtful"), citing *Cherokee County* v *Cunningham,* 68 So 2d 507 (Ala. 1953).

288

a cost of doing business just as much as labor, supplies, materials, etc. are a cost of doing business. Before the tax was increased from 2 and 4 mills to 2.2% in 1971, some of the utilities had the rate imbedded in their rate bases and most consumers were not even aware of it.

Letter of Jan. 3, 1977, *supra.*

Notwithstanding these constructions of § 53 by state officials, however, the characterization of state taxes for the purpose of determining the legal incidence on federally immune institutions is ultimately a federal question. *Diamond National Corp.* v. *State Board of Equalization, supra; First Agricultural National Bank* v. *Massachusetts State Tax Comm'n, supra; United States* v. *California State Board of Equalization, supra.* Thus, while the Attorney General and Revenue Department statements are instructive of the Alabama legislature's intent, such interpretations are not binding on the federal courts, and are not, therefore, necessarily determinative in our inquiry.[24]

The second factor suggested by the *Leavenworth* court as indicative of the legal incidence of a particular tax involves consideration of the rights and obligations of the parties to the transaction on which the tax is imposed. The license tax imposed by § 53 is imposed on the privilege of selling electricity by electric or hydroelectric public utilities to retail customers within the State. *See generally State* v. *Southern Electric Generating Co.,* 151 So. 2d 216 (Ala. 1963). As discussed above, the statutory language, by its literal terms as well as its construction by the Department of Revenue and the State Attorney General, creates a legal obligation only on utility companies. Although the Commission's order purports to impose a legal obligation for a proportionate share of the license tax on the utilities' customers, the statutory obligation to remit the revenue collected pursuant to § 53 still rests with the utility companies. Furthermore, the statute makes no provisions for direct collection of the fees from the utilities' customers, nor does it impose any penalties on the customers for failure to pay that part of their bills which constitutes a proportionate share of the license tax.

Nor do we believe that the statute creates so strong an economic incentive to pass the tax on as to compel the utility companies to collect the fees from their customers. *See, e.g., United States* v. *California State Board of Equalization, supra.* Although the 1.8 percent increase in license taxes enacted by the legislature does not pose an insignificant financial burden for the utility companies, we cannot say, without more, that the increase is evidence of the legislature's intent to shift the legal incidence of the tax from the utilities to the customers.[25]

---

[24] As in the *Leavenworth* and *Maryland* cases discussed *supra,* an argument may be made that the § 53 license tax is a user fee levied on the public utility companies for the privilege of using public lands to operate their businesses See nn. 17, 18, *supra.* As previously noted, such a characterization of the tax would render the analysis contained in this section moot, as intergovernmental immunities are not applicable to user fees See *United States* v *Massachusetts, supra* However, we do not have sufficient information regarding the purposes of the tax and the contractual arrangements between the utilities and the State to make such a determination.

[25] Notwithstanding the mandatory language of the Commission's 1969 order, we believe that the *Leavenworth* court's reliance, in analogous circumstances, on the language of the taxing statute was both correct and appropriate to the facts before us "[S]o far as the [taxing authority's] interest in collection is concerned, there is no requirement that [the utility] pass on to the United States all or any part of the financial burden of the [license tax] fee." *Leavenworth, supra,* 443 F. Supp at 282. *See generally Gurley* v. *Rhoden, supra*

The fact that the tax was increased with knowledge—whether actual or constructive—of the 1969 Commission order is not determinative of the legislature's intent in enacting § 53; were the Commission's order purporting to construe the statutory predecessors of § 53, the District Counsel's argument might well be conclusive. *See East Brewton Materials, supra,* 233 So. 2d at 754 ("The re-enactment without change of a statute which has been given a uniform construction by the administrative department [charged with the duty of administering the tax laws] 'may be treated as legislative approval of the departmental construction of the statute, quite as persuasive as the re-enactment of a statute, which has been judicially construed,' " citing *State* v. *Southern Electric Generating Co.,* 151 So. 2d 216 (Ala. 1963)).

As it is, however, we are faced with a regulatory order promulgated in 1969 which, if applied to the license tax statute that was re-enacted in 1971, would conflict with the terms of that statute. We are not aware of the 1969 order's having been construed to apply to the § 53 license tax or to its predecessor; to the contrary, we do have statements by the Alabama Revenue Department and the Attorney General construing § 53 as a license tax on the utilities, "a cost of doing business [which] can be included in the rate base allowed by the Alabama Public Service Commission." Letter from Corporate Tax Specialist, Franchise, Tax Division, *supra; see* Letter from Assistant Attorney General, *supra;* Memorandum from counsel to the Legal Division, Department of Revenue, *supra.*[26] In circumstances where such ambiguity exists, we believe that the language of the taxing statute, construed "in the light of all the circumstances," must prevail. *United States* v. *Maryland, supra,* 471 F. Supp. at 1040. *See Gurley* v. *Rhoden, supra; United States* v. *California State Board of Equalization, supra; East Brewton Materials, supra,* 233 So. 2d at 754 (the "legislative ratification of prior administrative interpretations" rule of construction cited above should be laid aside "where it seems reasonably certain that the administrator's interpretation has been erroneous and that a different construction is required by the language of the act").

In addition, the Comptroller General of the United States recently considered the § 53 license tax which is presently at issue and determined that the legal incidence of the tax falls on the utility companies and not on the United States. Dec. Comp. Gen. B–204517, "Veteran's Administration Medical Centers— Payment of Alabama Public Utility License Tax" (Feb. 22, 1982). The Comptroller General reasoned that the failure of the statutory terms of § 53 to require that the tax be passed through to customers, as well as their failure to provide a mechanism for doing so, is indicative of the Alabama Legislature's intent that the

---

[26] We are not unaware of the February 11, 1980, letter from the Director of the Utility Financial Analysis and Auditing Division of the Public Service Commission to the District Counsel of the Veterans Administration interpreting the Commission's 1969 order to "require [the] Alabama Power Company to pass each applicable increase in taxes directly through to its retail customers as a line item on the customer's bill." This interpretation is, at best, a construction of its own order as applied to taxing statutes in general, considered without regard to the statutory language underlying the specific utility tax with which we are presently concerned. Moreover, we believe that the opinion of the Attorney General carries greater weight than that of the Commission *See generally State* v *Southern Electric Generating Co., supra,* 151 So. 2d at 218

incidence of the license tax remain on the utilities. The Comptroller General disputed the VAMCs' claim that the Public Service Commission's order transferred the legal incidence of the tax to the customers; rather, he found that the Commission's order "merely provides that the utilities shall pass the economic burden of the tax to their customers as part of their rates." *Id.* at 3. The Comptroller General determined that the VAMCs should return to the Alabama Power Company that portion of their utility bills which they have erroneously withheld.

Were the statutory terms of § 53 less clear in this case, the Commission's order, as construed by the District Counsel and the Director of the Utility Financial Analysis Division of the Public Service Commission, might carry greater weight in our determination of where the legal incidence of the tax falls. We also have no other indication that the statute was ever intended to impose a direct tax on the utilities' customers; to the contrary, we have statements by the state's highest legal officer construing the license tax as a tax on the utilities. While it is reasonable to assume that the legislature believed that any tax increase would be recovered in customer billings as a cost of doing business, it is equally clear that it did not impose a statutory requirement that the utilities pass the increase on to customers. In addition, we have the benefit of the Comptroller General's consideration of this issue, his analysis and conclusions. In short, we are guided, as was the court in *United States* v. *Maryland, supra,* by the principle recognized by the Supreme Court in *Graves* v. *New York ex rel. O'Keefe,* 306 U.S. 466, 483 (1939), that "the implied immunity of one government and its agencies from taxation by the other should as a principle of statutory construction be narrowly restricted." *See United States* v. *Maryland, supra,* 471 F. Supp. at 1039. *See also United States* v. *New Mexico, supra,* 455 U.S. at 733–38.

### IV. Conclusion

In view of the clear language used by the Alabama legislature in imposing the § 53 utility license tax, particularly as it has been interpreted by the Revenue Department and the Attorney General of the State of Alabama, and the Comptroller General of the United States, and viewed "in the light of all the circumstances," *United States* v. *Maryland, supra,* 471 F. Supp. at 1040, we are persuaded that the disputed license tax is a constitutionally valid tax levied on the public utility companies within the State. Although the 1969 order of the Alabama Public Service Commission may have increased the economic burden of the license tax on the utility companies, a burden which will ultimately be borne by the Veterans Administration and other federal agencies in the State which are customers of the taxed utilities, we believe, for all of the reasons discussed above, that the legal incidence of the license tax continues to rest on the utilities.

LARRY L. SIMMS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*